880 F.2d 1188
 58 USLW 2127
 Terry Darnell DUNN, Plaintiff-Appellant,
v.
Thomas WHITE, Warden; Charlie Arnold, Major; T. Bill
Randall; Brad Payas, H.S.A.; Larry Meachum,
Director, D.A.C., Oklahoma; Jim Burks,
P.A., Defendants-Appellees.
 No. 88-2194.
 United States Court of Appeals,
Tenth Circuit.
 Aug. 1, 1989.
 
 Terry Darnell Dunn, pro se.
 Robert H. Henry, Atty. Gen., and Sue Wycoff, Asst. Atty. Gen., Oklahoma City, Okl., for defendants-appellees.
 Before MCKAY and ANDERSON, Circuit Judges, and BROWN,* District Judge.
 PER CURIAM.
 
 
 1
 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir. R. 34.1.9. The cause is therefore ordered submitted without oral argument.
 
 
 2
 Plaintiff appeals the district court's dismissal of his complaint filed pursuant to 42 U.S.C. Sec. 1983. Plaintiff alleged that prison officials assaulted him and threatened to place him in disciplinary segregation when he refused to submit to a blood test for acquired immune deficiency syndrome (AIDS). Plaintiff contended that by threatening him with disciplinary segregation, prison officials in effect forced him to submit to the blood test. Plaintiff argued that threatening him and testing his blood prior to a due process hearing violated his rights under the fourteenth amendment, and that his religious beliefs forbade his being tested for AIDS.
 
 
 3
 The district court referred plaintiff's pro se complaint to a United States magistrate, who recommended that the district court dismiss the complaint for failure to state a claim for a deprivation of plaintiff's constitutional rights. The magistrate reasoned that the prison could limit plaintiff's freedoms for legitimate penological purposes and that identifying AIDS carriers was such a purpose.
 
 
 4
 In his objection to the magistrate's report and recommendation, plaintiff argued that AIDS testing served no legitimate purpose, because after identifying carriers, the prison neither treated nor quarantined those prisoners. Plaintiff also contended that the Oklahoma statute requiring AIDS testing contained an exemption for prisoners with religious objections.
 
 
 5
 Because it concluded that plaintiff's objections to the magistrate's report were untimely, the district court refused to consider them. The district court adopted the magistrate's recommendation and dismissed plaintiff's complaint. We affirm.
 
 
 6
 "The sufficiency of a complaint is a question of law which we review de novo." Morgan v. City of Rawlins, 792 F.2d 975, 978 (10th Cir.1986). In reviewing the dismissal of a complaint, "[a]ll well-pleaded facts, as distinguished from conclusory allegations, must be taken as true." Swanson v. Bixler, 750 F.2d 810, 813 (10th Cir.1984). In addition, we will take the allegations in plaintiff's objections to the magistrate's report as true. Although plaintiff's objections were filed in the district court beyond the ten-day limit, plaintiff mailed his objections from prison in a timely fashion. Cf. Houston v. Lack, --- U.S. ----, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988) (mailing date of prisoner's notice of appeal deemed filing date). On appeal, we will accordingly consider plaintiff's objections as allegations in support of his constitutional claims.
 
 
 7
 "When a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff, dismissal on Rule 12(b)(6) grounds is appropriate...." Neitzke v. Williams, --- U.S. ----, 109 S.Ct. 1827, 1833, 104 L.Ed.2d 338 (1989). At the same time, however, "[a] constitutional claim under Sec. 1983 should not be dismissed unless it appears beyond doubt that the plaintiff could prove no set of facts in support of his claim that would entitle him to relief." Meade v. Grubbs, 841 F.2d 1512, 1526 (10th Cir.1988) (citation omitted). "Moreover, pro se complaints, like the one involved here, are held 'to less stringent standards than formal pleadings drafted by lawyers.' " Id. (quoting Hughes v. Rowe, 449 U.S. 5, 9, 101 S.Ct. 173, 175, 66 L.Ed.2d 163 (1980) and Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972)).
 
 
 8
 Plaintiff's factual allegations that he refused consent to a medical test on religious grounds, and was then forced to submit to the test, at least facially support claims under the first and fourth amendments, as incorporated into the fourteenth. In light of the liberal construction accorded pro se pleadings, we will analyze plaintiff's complaint under both amendments. See Haines, 404 U.S. at 520, 92 S.Ct. at 596. We will also address plaintiff's argument that he was entitled to a due process hearing prior to the blood test and the threat of disciplinary segregation.
 
 I. FOURTH AMENDMENT
 
 9
 No court has yet decided whether a nonconsensual AIDS test violates a prisoner's right to be free from an unreasonable search. The Supreme Court, however, has addressed the fourth amendment rights of prisoners in other contexts. In Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), the Court held that prisoners had no legitimate expectation of privacy in their prison cells, and accordingly had no interest against even an unreasonable search of their cells.
 
 
 10
 A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order. We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security. We believe that it is accepted by our society that "[l]oss of freedom of choice and privacy are inherent incidents of confinement."
 
 
 11
 Id. at 527-28, 104 S.Ct. at 3201 (quoting Bell v. Wolfish, 441 U.S. 520, 537, 99 S.Ct. 1861, 1873, 60 L.Ed.2d 447 (1979)).
 
 
 12
 Although the Supreme Court has thus foreclosed any fourth amendment challenge to the search of a prison cell, this court has recognized a qualitative difference between property searches and searches of a prisoner's person. The prisoner's privacy interest in the integrity of his own person is still preserved under Wolfish, 441 U.S. at 558, 99 S.Ct. at 1884, in which the Supreme Court applied traditional fourth amendment analysis to a constitutional challenge by prisoners to personal body searches.
 
 
 13
 In Wolfish, the Supreme Court assumed that prison inmates retain some measure of Fourth Amendment rights. Id. We do not believe that the Supreme Court's decision in Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) in which the Court held that a prisoner has no reasonable expectation of privacy in his prison cell, eviscerates the requirement set forth in Wolfish that personal body searches of inmates must be reasonable under the circumstances. See Hudson, 468 U.S. at 555 n. 31, 104 S.Ct. at 3216 n. 31 (Stevens, J., dissenting).
 
 
 14
 Levoy v. Mills, 788 F.2d 1437, 1439, n. ** (10th Cir.1986); accord Spence v. Farrier, 807 F.2d 753 (8th Cir.1986) (applying traditional fourth amendment analysis to a prisoner's claim that urinalysis to detect drugs violated his right to be free from unreasonable searches).
 
 
 15
 The Supreme Court in Wolfish held that even assuming prisoners retained a privacy interest in their own persons, a post-visitation body cavity search nonetheless was not an unreasonable search under the fourth amendment. The Court emphasized that "preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of convicted prisoners." Wolfish, 441 U.S. at 546, 99 S.Ct. at 1878 (footnote omitted). "Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel.... Accordingly, we have held that even when an institutional restriction infringes a specific constitutional guarantee, ... the practice must be evaluated in light of the central objective of prison administration, safeguarding institutional security." Id. at 547, 99 S.Ct. at 1878 (citations omitted). Thus, on issues of "internal order and discipline" or "institutional security," courts should accord "wide-ranging deference" to prison officials, unless there is "substantial evidence in the record to indicate the officials have exaggerated their response." Id. at 547-48, 99 S.Ct. at 1879 (citations and quotation omitted).
 
 
 16
 Within this framework, the Supreme Court in Wolfish addressed the fourth amendment claim.
 
 
 17
 In each case [the fourth amendment] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.
 
 
 18
 Id. at 559, 99 S.Ct. at 1884 (citations omitted).
 
 
 19
 Although no court has addressed whether mandatory testing for AIDS violates the fourth amendment rights of prisoners, the courts have addressed the issue of prison drug tests. Drug testing in prison implicates concerns similar to those at issue in the case at bar. In Spence, 807 F.2d at 755, the Eighth Circuit considered whether random urinalysis for the presence of drugs violated a prisoner's fourth amendment rights. Balancing the security interests of the prison against the prisoner's privacy interest, the court concluded that the plague of unauthorized narcotics in prison justified the intrusion on the prisoner's already diminished privacy interest, so long as the testing was random. Id.; accord Storms v. Coughlin, 600 F.Supp. 1214, 1218-20 (S.D.N.Y.1984).
 
 
 20
 In contrast, in Berry v. District of Columbia, 833 F.2d 1031 (D.C.Cir.1987), the District of Columbia Circuit perceived a potential intrusion on the fourth amendment rights of pretrial detainees tested for drugs. Detainees were tested and treated for drug abuse as a condition of pretrial release. In approving the testing as a condition of release, the district court had assumed a nexus between drug usage and pretrial criminality or failure to appear. The district court had also assumed that arrestees were potential drug users. The District of Columbia Circuit questioned these assumptions, and accordingly remanded to the district court for further factual development.
 
 
 21
 The facts in Spence are more analogous to the circumstances at bar. In Berry, drug testing was a condition of release of pretrial detainees, who would otherwise be at liberty to leave prison. Although the Supreme Court has indicated that a prison's internal security concerns are the same for pretrial detainees, see Wolfish, 441 U.S. at 546 n. 28, 99 S.Ct. at 1878 n. 28, the plaintiffs in Berry would not otherwise be detained in prison were it not for their refusal to submit to a drug test. Thus, the prison's security concerns were not internal to the prison; rather, the authorities assumed that drug testing would prevent the release of prisoners who were a flight risk or a risk to society while they were awaiting trial. The court required a factual showing supporting the theory behind denying release to these particular detainees.
 
 
 22
 The court in Berry distinguished between drug testing in a criminal context versus testing at the workplace. The court noted that the "criminal context obviously raises questions different from those raised in the employment context." Berry, 833 F.2d at 1035 n. 16. We agree with the D.C. Circuit that searches in a noncriminal context such as this one[1] raise different constitutional concerns than those implicated in Berry.[2] In National Treasury Employees Union v. Von Raab, 816 F.2d 170, 179 (5th Cir.1987), aff'd in part, vacated in part, --- U.S. ----, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), however, the Fifth Circuit has gone further to suggest that drug testing in a noncriminal context is less likely to require judicial protection. In Von Raab, the court considered the constitutional implications of drug testing of customs employees applying for job transfers. "While the fourth amendment protects against invasions for civil as well as criminal investigatory purposes, the need for protection against governmental intrusion diminishes if the investigation is neither designed to enforce criminal laws nor likely to be used to bring criminal charges against the person investigated." Id. (citing South Dakota v. Opperman, 428 U.S. 364, 370 n. 5, 96 S.Ct. 3092, 3097 n. 5, 49 L.Ed.2d 1000 (1976); accord Colorado v. Bertine, 479 U.S. 367, 371-73, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987); see also O'Connor v. Ortega, 480 U.S. 709, 720-25, 107 S.Ct. 1492, 1500-01, 94 L.Ed.2d 714 (1987)).
 
 
 23
 To the extent that the Fifth Circuit has suggested that in noncriminal contexts, governmental intrusions on the fourth amendment rights of citizens are subject to a lower standard of judicial scrutiny, we disagree with the reasoning of that court. Supreme Court precedent does not require painting with such a broad brush. Indeed, in National Treasury Employees Union v. Von Raab, --- U.S. ----, 109 S.Ct. 1384, 1393, 103 L.Ed.2d 685 (1989), the Supreme Court affirmed in part the Fifth Circuit's holding, but did not suggest that a lower standard of scrutiny should be applied to workplace searches. The Court emphasized the need in Von Raab for a separate standard for noncriminal fourth amendment challenges, noting that the probable cause standard was particularly unhelpful in analyzing the reasonableness of "routine administrative functions, especially where the Government seeks to prevent the development of hazardous conditions." Id. 109 S.Ct. at 1391-92 (citations omitted). The Court nonetheless balanced the government's "compelling interest" against the potentially substantial "interference with individual freedom" resulting from mandatory urinalysis. Id. 109 S.Ct. at 1393.
 
 
 24
 Similarly, in Skinner v. Railway Labor Executives' Association, --- U.S. ----, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), the Supreme Court balanced the government's need against the worker's privacy interest. The Court decided a challenge by railway workers to the railway's blood and urine tests following certain train accidents. The Court first recognized the fourth amendment's application to this challenge.
 
 
 25
 In light of our society's concern for the security of one's person, see, e.g., Terry v. Ohio, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968), it is obvious that this physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable. The ensuing chemical analysis of the sample to obtain physiological data is a further invasion of the tested employee's privacy interests.
 
 
 26
 Skinner, 109 S.Ct. at 1412 (citation omitted).
 
 
 27
 At the same time, however, the Court recognized that there is a question whether the traditional warrant or probable cause standards are reasonable in a noncriminal context, where the government's interest could never be served if individualized suspicion were necessary before every search. Id. 109 S.Ct. at 1412. "In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." Id. at 1417. Officials are not required to justify searches within this "special needs" category under "the usual warrant and probable-cause requirements." Id. at 1414.
 
 
 28
 Thus, in limited circumstances, the distinction between criminal and civil justifications for testing indeed may become dispositive, but not because the search is less intrusive on the citizen. Rather, the very nature of the government's need makes warrant and probable cause requirements unworkable, if not meaningless. See, e.g., Bertine, 479 U.S. at 371, 107 S.Ct. at 741; O'Connor, 480 U.S. at 722-24, 107 S.Ct. at 1500-01. The individual's privacy interest, however, remains unchanged, regardless whether the government is pursuing civil or criminal objectives, and the courts must still inquire whether the government's need outweighs the individual's privacy interest. See, e.g., Bertine, 479 U.S. at 372-74, 107 S.Ct. at 741-42 (balancing strong governmental interest in automobile inventory against citizen's diminished expectation of privacy in an automobile); O'Connor, 480 U.S. at 725, 107 S.Ct. at 1500-02 (balancing substantial governmental interest in operation of workplace against "not insubstantial" privacy interest of employees in their place of work). Thus, the level of judicial scrutiny does not diminish, but rather changes in kind.
 
 
 29
 The government's interest in the operation of a prison presents " 'special needs' beyond law enforcement that may justify departures from the usual warrant and probable-cause requirements." Skinner, 109 S.Ct. at 1414 (citation omitted); see also Von Raab, 109 S.Ct. at 1391-92. Under the reasoning in Skinner and Von Raab, this court must therefore balance the intrusiveness of the blood test against the prison's need to administer the test. Although the two sides of the equation are the same as they are in the free world, plaintiff's incarceration changes the relative weight accorded each interest. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987). "[T]here must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it. Thus, a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." Id. at 89-90, 107 S.Ct. at 2262.[3]
 
 
 30
 In or out of prison, plaintiff has only a limited privacy interest in not having his blood tested. In Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the Supreme Court held that a state could constitutionally "search" a drunken driving suspect by testing his blood. "The intrusion perhaps implicated Schmerber's most personal and deep-rooted expectations of privacy, and the Court recognized that fourth amendment analysis thus required a discerning inquiry into the facts and circumstances to determine whether the intrusion was justifiable." Winston v. Lee, 470 U.S. 753, 760, 105 S.Ct. 1611, 1616, 84 L.Ed.2d 662 (1985). The Court concluded that the intrusion, while implicating "deep-rooted expectations of privacy," was nonetheless minimal. "In noting that a blood test was 'a commonplace in these days of periodic physical examinations,' Schmerber, 384 U.S. at 771, 86 S.Ct. at 1836, Schmerber recognized society's judgment that blood tests do not constitute an unduly extensive imposition on an individual's personal privacy and bodily integrity." Winston, 470 U.S. at 762, 105 S.Ct. at 1617. "A crucial factor in analyzing the magnitude of the intrusion in Schmerber is the extent to which the procedure may threaten the safety or health of the individual. '[F]or most people [a blood test] involves virtually no risk, trauma, or pain.' " Winston, 470 U.S. at 761, 105 S.Ct. at 1617 (quoting Schmerber, 384 U.S. at 771, 86 S.Ct. at 1836).
 
 
 31
 Plaintiff's privacy expectation is at least as limited as the plaintiff's in Schmerber. Moreover, in concluding that prison drug testing passed constitutional muster in Spence, the Eighth Circuit relied on the fact that in prison, an individual's "expectation of privacy in his or her body is diminished." Spence, 807 F.2d at 755; see also Storms, 600 F.Supp. at 1224. We agree with the Eighth Circuit that plaintiff's privacy expectation in his body is further reduced by his incarceration, a fact recognized by the Supreme Court in Wolfish, 441 U.S. at 537, 99 S.Ct. at 1873.
 
 
 32
 On the other side of the equation, the prison's stated justification in district court for the intrusion was the need to control the spread of AIDS. In its brief in support of its motion to dismiss, the state asked the district court to take judicial notice that
 
 
 33
 [t]he topic of AIDS and its methods of transmission have been constantly publicized in the last few years. All authorities have agreed that the disease is capable of being transmitted through sexual intercourse, is infectious, and is dangerous to the public health....
 
 
 34
 Therefore, the Defendants have a statutory duty to test individuals incarcerated at Conner Correctional Center for AIDS.
 
 
 35
 The prison's interest in responding to the threat of AIDS, or any contagious disease occurring in prison, is obviously strong. Indeed, in Glick v. Henderson, 855 F.2d 536 (8th Cir.1988), the Eighth Circuit suggested that in limited circumstances, a prison's failure to protect prisoners from fellow inmates carrying AIDS may violate the eighth amendment. See also Lareau v. Manson, 507 F.Supp. 1177, 1194, 1195 n. 22 (D.Conn.1980) (failure to screen prisoners for communicable disease violates constitutional rights of other prisoners), aff'd in part, modified in part on other grounds, and remanded, 651 F.2d 96 (2d Cir.1981). In limited circumstances, the state's interest in public health may even justify a similar intrusion on free world residents. See Prince v. Massachusetts, 321 U.S. 158, 166-67, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944) (dicta suggesting that mandatory immunization of children is constitutional); Jacobson v. Massachusetts, 197 U.S. 11, 31, 38, 25 S.Ct. 358, 363, 366, 49 L.Ed. 643 (1905) (compulsory vaccination is constitutional); cf. Compagnie Francaise De Navigation a Vapeur v. Louisiana State Board of Health, 186 U.S. 380, 391, 22 S.Ct. 811, 816, 46 L.Ed. 1209 (1902) (use of quarantine power is constitutional absent conflict with Congressional enactment preempting state's authority). For example, in Reynolds v. McNichols, 488 F.2d 1378, 1382 (10th Cir.1973), this court, noting the existence of a "virtual epidemic" of venereal disease in Denver, upheld a municipality's power to require testing for the disease for prostitutes, even if they are not at that time under arrest. The court relied primarily on a legitimate general suspicion of contagion in prostitutes, rather than on any individualized suspicion of the plaintiff. Id. Although the plaintiff in Reynolds had also once tested positive for venereal disease, this court considered this fact only as a secondary factor supporting the legitimate objectives of the test. Id. at 1382. Thus, in the area of public health, this court has suggested that testing of all those within a suspicious class sometimes may be justified.
 
 
 36
 The goal of controlling the spread of venereal disease may justify coerced medical testing in limited circumstances. In accord with this view, the district court concluded that the prevention of the spread of AIDS in prison would justify the intrusion of a blood test. We agree that the district court could take judicial notice of the seriousness and the potential for transmissibility of the disease AIDS. Moreover, although a review of the record does not reveal whether there is currently a widespread AIDS infection among the prisoners, an attempt to ascertain the extent of the problem is certainly a legitimate penological purpose. The prison cannot determine the amount of infection without testing. Thus, even assuming that the spread of AIDS in prison is not any greater than its spread in the general population, this fact would not substantially weaken the prison's strong interest in determining who in the population currently carries AIDS.
 
 
 37
 For similar reasons, the lack of any indication in the record that AIDS is communicable among prisoners who do nothing but live together does not diminish the prison's interest in testing. The United States government has stated that everyday contact does not create a risk of infection. Glick, 855 F.2d at 539 n. 1. For this reason, the Eighth Circuit has rejected the argument that even without specific allegations supporting a personal risk of contagion, a prison's failure to test for AIDS and segregate infected prisoners constitutes cruel and unusual punishment. Id. at 539. The eighth amendment, however, defines only the minimum treatment of prisoners; regardless whether the prison has a constitutional obligation to do so, it has an interest in making an extra effort to protect prisoners from a fatal disease. Moreover, the prison, as caretaker, has an interest in diagnosing and providing adequate health care to those already infected with AIDS.
 
 
 38
 In light of the seriousness of the disease and its transmissibility, we conclude that the prison has a substantial interest in pursuing a program to treat those infected with the disease and in taking steps to prevent further transmission. We further conclude that the prison's substantial interest outweighs plaintiff's expectation of privacy.
 
 
 39
 Although the government in these circumstances is not required to demonstrate individualized suspicion, it still must demonstrate that the search is a " 'sufficiently productive mechanism to justify [its] intrusion upon Fourth Amendment interests.' " Von Raab, 109 S.Ct. at 1395 (quoting Delaware v. Prouse, 440 U.S. 648, 658-59, 99 S.Ct. 1391, 1398-99, 59 L.Ed.2d 660 (1979)). That is, although we have now decided that the prison's interest in treating and preventing the spread of AIDS outweighs the prisoner's privacy interest, this court must still inquire whether the method chosen to effect the prison's interest is a "productive mechanism." See, e.g., Glover v. Eastern Neb. Community Office of Retardation, 867 F.2d 461, 462 (8th Cir.1989) (holding that there was an insufficient nexus between testing social workers for AIDS and preventing the spread of AIDS in the disabled population to justify coerced testing). The remaining question therefore is, does AIDS testing by the prison in fact serve the goal of appropriately responding to the presence of AIDS in the inmate population?
 
 
 40
 In district court, plaintiff responded to all the justifications proffered by the prison by alleging that the prison does not quarantine or treat infected prisoners. Thus, for purposes of reviewing the district court's dismissal of plaintiff's complaint, we must assume that the prison does not currently use the information it gathers either to treat or to control the spread of AIDS. Meade, 841 F.2d at 1526.
 
 
 41
 The alleged lack of a current medical response to the problem does not mandate this court's forbidding prison officials from continuing to collect information on the spread of AIDS within prison walls. The prison will ultimately bear responsibility for decisions on segregation and treatment, and certainly it is reasonable to attempt to avoid making such decisions in a vacuum.[4] At the very least, "the logical connection between the regulation and the asserted goal" of treating and preventing the spread of AIDS is not "so remote as to render the policy arbitrary or irrational." Turner, 482 U.S. at 89-90, 107 S.Ct. at 2262.[5]
 
 
 42
 Finally, in Wolfish, the Supreme Court explained that in balancing the prison's need against plaintiff's interest, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Wolfish, 441 U.S. at 559, 99 S.Ct. at 1884 (citations omitted). Similarly, in Winston, the Supreme Court emphasized the importance of the nonintrusiveness of the manner of blood testing, as well as the commonplace nature of the test itself, in the Court's previous approval of the blood testing in Schmerber. "[A]ll reasonable medical precautions were taken and no unusual or untested procedures were employed in Schmerber; the procedure was performed 'by a physician in a hospital environment according to accepted medical practice.' " Winston, 470 U.S. at 761, 105 S.Ct. at 1617 (citing Schmerber, 384 U.S. at 771, 86 S.Ct. at 1836); see also Berry, 833 F.2d at 1036 (explaining that "the [d]istrict [c]ourt must determine whether the testing program is 'no more degrading than is reasonably necessary.' ") (quotation omitted).
 
 
 43
 In the complaint before us, plaintiff did not allege that the manner or place of the test was unreasonable. Although we must liberally construe plaintiff's factual allegations, Haines, 404 U.S. at 520, 92 S.Ct. at 596, we will not supply additional facts, nor will we construct a legal theory for plaintiff that assumes facts that have not been pleaded. See Neitzke, 109 S.Ct. at 1834 n. 9. Thus, the sole issue before this court is whether nonconsensual testing for AIDS, without more, violates the fourth amendment rights of prisoners. We hold that it does not.
 
 II. FIRST AMENDMENT
 
 44
 In district court, plaintiff alleged that he refused to consent to a test for AIDS on "religious grounds." He argued that Oklahoma statutes provide a religious exemption from testing. The statutory exemption upon which plaintiff relies, however, may not apply to prisoners. See Okla.Stat. tit. 63, Sec. 1-516.1.[6] In any event, the exemption is for those "who, because of religious belief, in good faith select[ ] and depend[ ] upon spiritual means or prayer for the treatment or cure of disease." Id. at Sec. 1-516.1. Plaintiff's vague allegation that he declined AIDS testing on generic "religious grounds" does not implicate this exemption.
 
 
 45
 Similarly, plaintiff has failed to state a claim that the prison deprived him of freedom of religion. The Supreme Court has recognized that prisoners retain the right to religious freedom, although prisons may place restrictions on the overt exercise of the right for legitimate penological reasons. See O'Lone v. Estate of Shabazz, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987); see also Cruz v. Beto, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081-82, 31 L.Ed.2d 263 (1972). Plaintiff's conclusory allegations, however, do not require us to reach the issue whether the prison's interest in testing for AIDS overrides plaintiff's interest in expressing his religious beliefs by declining to be tested. Plaintiff did not accompany his allegation with any details about his religious faith, nor did he allege what tenet of his faith required that he refuse the test.
 
 
 46
 A "philosophical and personal" choice "does not rise to the demands of the Religion Clauses." Wisconsin v. Yoder, 406 U.S. 205, 216, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972). "[T]o have the protection of the Religion Clauses, the claims must be rooted in religious belief.... [T]he very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests." Id. at 215-16, 92 S.Ct. at 1533. Although plaintiff in the case at bar continuously has asserted religious objections to AIDS testing, at no time has he gone any further than merely reciting the word "religion." The mere assertion of generic religious objections is not sufficient to invoke first amendment protections.
 
 
 47
 In Frazee v. Illinois Department of Employment Security, --- U.S. ----, 109 S.Ct. 1514, 1516, 103 L.Ed.2d 914 (1989), the Supreme Court decided this term that a person need not belong to an "established religious sect or church," or claim that his action resulted from a "tenet, belief or teaching of an established religious body" to seek the protection of the first amendment's freedom of religion clause. In Frazee, however, an employee turned down Sunday employment because, "as a Christian, he could not work on the 'Lord's day.' " Id. 109 S.Ct. at 1515. The sincerity and religious nature of Mr. Frazee's beliefs were not at issue. Rather, the Court decided only the narrow issue whether adherence to the beliefs of an organized group or sect was the only "religion" entitled to recognition under the first amendment. Id. 109 S.Ct. at 1517. In contrast to Mr. Frazee, plaintiff has not provided any details about either his religious faith or how it forbids his being tested for AIDS. By relying entirely on the word "religious" rather than on any specific belief, whether as part of a personal faith or as a tenet of an organized group or sect, plaintiff has supported his first amendment claim with only a conclusory allegation of religious exemption.
 
 
 48
 Plaintiff's vague assertion that he refused AIDS testing on generic "religious grounds" thus will not sustain a claim that he was entitled to any first amendment protection against testing. Although plaintiff's basis for declining to be tested may indeed be religious, and therefore entitled to first amendment protection, this essential allegation cannot be derived from the facts as pleaded. "Constitutional rights allegedly invaded, warranting an award of damages, must be specifically identified. Conclusory allegations will not suffice." Wise v. Bravo, 666 F.2d 1328, 1333 (10th Cir.1981) (citing Brice v. Day, 604 F.2d 664 (10th Cir.1979,) cert. denied, 444 U.S. 1086, 100 S.Ct. 1045, 62 L.Ed.2d 772 (1980)). Without more specific allegations, plaintiff's complaint fails to state a claim that the prison violated his right to religious freedom.
 
 III. DUE PROCESS
 
 49
 Plaintiff also alleged in his complaint that he was entitled to a due process hearing before the prison threatened him with disciplinary segregation because of his refusal to submit to an AIDS test. The Supreme Court has recognized that in some circumstances, a hearing may be required prior to placing a prisoner in disciplinary segregation. See Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). Here, however, plaintiff alleged only that he was threatened with prison discipline. We see no merit in plaintiff's argument that he was entitled to a due process hearing prior to being threatened with segregation or prior to being tested for AIDS. The mere threat of segregation, without more, does not infringe on a prisoner's protected liberty interest. See Kentucky Dep't of Corrections v. Thompson, --- U.S. ----, 109 S.Ct. 1904, 1909, 104 L.Ed.2d 506 (1989) (explaining manners by which state or prison may create liberty interest in prisoner). Moreover, since we have approved AIDS testing as a general matter, an individualized due process hearing would not assist plaintiff, since there are no factual or legal disputes to resolve.
 
 
 50
 The judgment of the United States District Court for the Northern District of Oklahoma is AFFIRMED. On appeal, plaintiff seeks a copy of a prison report on his case which he believes was filed in district court. No such report appears in the record on appeal or on the district court's docket sheet. The motion is accordingly DENIED.
 
 
 51
 The mandate shall issue forthwith.
 
 McKAY, Circuit Judge, dissenting:
 
 52
 This case was dismissed for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6), Fed.R.Civ.P. That fact is the analytical key to this case. It alone dictates my dissent.
 
 
 53
 Plaintiff has alleged that there is no treatment or segregation for persons testing positive for AIDS in the prison where he is held. While under prevailing cases the prison would have to make only a small showing to justify AIDS testing, they must show some penological interest--not just curiosity or statistics gathering--to justify overcoming the plaintiff's Fourth Amendment interest in the integrity of his body. Levoy v. Mills, 788 F.2d 1437 (10th Cir.1986). No matter how serious a disease, unwilling prisoners may not be made mere guinea pigs for its study. The state must show some penal interest.
 
 
 54
 The effect of the majority opinion is far too sweeping. It in effect suggests that because of the known seriousness of AIDS, the prison need not even show its claimed interest. The prison has not even replied. I believe the unavoidable mandate of Levoy is that in the face of an allegation that the prison does not treat or segregate AIDS victims, responsive evidence or other showing of some penal interest is required. If treatment or segregation is in fact part of the prison program this testing clearly can survive a section 1983 claim. The majority cites language in the recent Supreme Court case, Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), which indicates that as long as there is even a remote connection between the policy at issue and the asserted goal, the policy is not arbitrary or irrational and is therefore sustainable. However, the Supreme Court emphasized that whether a regulation was reasonably related to legitimate penological interests was determined by analyzing various relevant factors.* Here we only decide whether this pro se petitioner has stated a claim upon which relief can be granted under 12(b)(6).
 
 
 55
 Treating this pro se pleading with the perspective mandated by the Supreme Court, Hughes v. Rowe, 449 U.S. 5, 9, 101 S.Ct. 173, 175, 66 L.Ed.2d 163 (1980), and Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972), I believe plaintiff has made a sufficient allegation of a protected religious interest in not being tested to survive a Rule 12(b) dismissal. Plaintiff alleged that he declined on "religious grounds". He further cited to an Oklahoma statute which specifies some grounds for exemption from traditional medical treatment. Okla.Stat. tit. 63, Sec. 1-516.1 (1984). This is sufficient to state a claim even if the statute itself ultimately may not apply to him. His citation to the statute makes sufficiently clear his grounds, especially in light of the great expansion of the coverage of the First Amendment in Frazee v. Illinois Dep't of Employment Sec., --- U.S. ----, 109 S.Ct. 1514, 103 L.Ed.2d 914 (1989). The Supreme Court in Frazee made clear that "we reject the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization." --- U.S. at ----, 109 S.Ct. at 1516-17. While, under Frazee, a plaintiff must show he or she holds a "sincere religious belief," that determination is a question of fact. It is inherent in a free exercise claim that one is contending that one has a sincere religious belief and that the challenged conduct violates it. It is not necessary to attach a copy of one's sacred texts to one's pleading. I believe this pro se complaint states a cause of action for violation of the First Amendment which, of course, could be rebutted by an appropriate state interest.
 
 
 
 *
 The Honorable Wesley E. Brown, District Judge, United States District Court for the District of Kansas, sitting by designation
 
 
 [1]
 Although plaintiff in the case at bar is in prison, there is nothing to suggest that the prison's AIDS testing program has a punitive objective, or that those testing positive will be denied release from prison in the future. Such an allegation would raise constitutional issues not present here
 
 
 [2]
 In agreeing with the D.C. Circuit that searches with a criminal investigative purpose raise constitutional issues different than those raised by searches in a noncriminal context, we suggest neither approval nor disapproval of the court's ultimate rejection of drug testing of pretrial detainees. We have no occasion to address the validity of drug testing of pretrial detainees as a way to enforce conditions of release. See, e.g., 18 U.S.C. Sec. 3142(c)(2)(I) (permitting judicial officer to condition release pending trial on refraining from illegal use of narcotic drugs). Indeed, we make no comment on mandatory drug testing, whether in or out of prison
 
 
 [3]
 In determining the reasonableness of the prison regulation, the Court went on in Turner to consider three additional factors. Under the Turner test, a court should also inquire whether the prisoner retains other avenues for exercising his constitutional right, whether accommodation of the asserted right would adversely affect the guards and other prisoners, and whether there is an absence of ready alternatives to the infringement of the right. Id. at 90, 107 S.Ct. at 2262
 To date, the Court has not applied its new test to prison regulations affecting a prisoner's fourth amendment rights. The Turner test appears analytically to have only limited applicability to a prisoner's fourth amendment challenge. The fourth amendment protects even free world residents only against "unreasonable" searches. Once a court has concluded that a prison search is not unreasonable, there is no infringement of a constitutional right, and thus the issue whether there is a possibility of "accommodating" a prisoner's fourth amendment right by some other means would not arise. See Bertine, 479 U.S. at 374, 107 S.Ct. at 742 (" 'The real question is not what "could have been achieved," but whether the Fourth Amendment requires such steps.' ") (quoting Illinois v. Lafayette, 462 U.S. 640, 647, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983) (emphasis in original)). Moreover, strict limitations on the fourth amendment rights of prisoners are always inherent in the fact of incarceration, Wolfish, 441 U.S. at 537, 99 S.Ct. at 1873, a truism not applicable to other constitutional rights.
 
 
 [4]
 Plaintiff did not directly challenge the prison's program of AIDS treatment, or the alleged lack thereof, nor its alleged failure to segregate prisoners carrying AIDS. The complex constitutional issues arising from such allegations are therefore not currently before us
 
 
 [5]
 Indeed, in Thornburgh v. Abbott, --- U.S. ----, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989), decided this term, the Supreme Court held there was a sufficient connection between prison security and censorship of prisoners' reading material to justify a federal prison regulation permitting the warden, within general guidelines, to censor entire publications rather than the individual objectionable articles contained within those publications. The prison justified its imprecise censorship by citing the administrative difficulties in deleting only objectionable articles. Certainly the connection between and the prison's legitimate penological interest in the health and security of the inmate population and mandatory testing for AIDS is as strong as the connection between the legitimate goals of security and efficiency and the extensive censorship of reading material approved in Thornburgh
 
 
 [6]
 Okla.Stat. tit. 63, Sec. 1-514 clearly applies only to the testing and treatment of eye infections in newborns. In contrast, Okla.Stat. tit. 63, Sec. 1-516.1 grants a religious exemption from the application of the "provisions of this act," which may refer only to the specific section concerning testing of pregnant women, or may refer to the entire Public Health Code. Under the latter construction, the prior exemption for newborns would be superfluous
 
 
 *
 In determining reasonableness, relevant factors include (a) whether there is a "valid, rational connection" between the regulation and a legitimate and neutral governmental interest put forward to justify it, which connection cannot be so remote as to render the regulation arbitrary or irrational; (b) whether there are alternative means of exercising the asserted constitutional right that remain open to inmates, which alternatives, if they exist, will require a measure of judicial deference to the corrections officials' expertise; (c) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, on inmates' liberty, and on the allocation of limited prison resources, which impact, if substantial, will require particular deference to corrections officials; and (d) whether the regulation represents an "exaggerated response" to prison concerns, the existence of a ready alternative that fully accommodates the prisoner's rights at de minimis costs to valid penological interests being evidence of unreasonableness. 482 U.S. at 84-91, 107 S.Ct. at 2259-62