[No. 58364-1. En Banc. March 11, 1993.]

*In the Matter of Juveniles* A, B, C, D, E.

84

*Suzanne Lee Elliott* of *Washington Appellate Defender Association,* for appellants.

*David S. McEachran, Prosecuting Attorney,* and *Greg Greenan, Deputy,* for respondent.

*Jacqueline S. Hebert* on behalf of the American Civil Liberties Union, amicus curiae for appellants.

DURHAM, J. — Five juveniles were found to have committed various sexual offenses under RCW 9A.44. Relying upon RCW 70.24.340(1)(a), which provides for mandatory AIDS testing of convicted sexual offenders, the Whatcom County

commissioner ordered the juveniles to submit to an HIV test. In a direct appeal, the juveniles challenge the applicability and constitutionality of this statute. We affirm the commissioner's ruling.

All of the sexual offenses were committed in Whatcom County. Juvenile "A", a 14-year-old male, was charged with the crime of indecent liberties, RCW 9A.44.100(1). Following a fact-finding hearing, the judge pro tempore found that on or about June 30, 1988, "A" had sexual contact with a younger boy through forcible compulsion. Specifically, "A" held the younger boy down and "used butter" to "sodomize[]" him.

Juvenile "B", a 14-year-old boy, was charged with first degree child molestation, RCW 9A.44.083, which occurred on July 15, 1988. "B" pleaded guilty to this charge, stating that he "kissed [a 4-year-old girl] on her breast and layed [*sic*] on top of her." The affidavit of probable cause further alleged that "B" "removed her pants and licked and kissed her vaginal area." The young girl originally told her parents that penetration had occurred, but later denied this to the police. The acts of molestation occurred while "B" was alone with the younger child for a period of time in his house.

Juvenile "C", a 15-year-old girl, was charged with three counts of first degree child molestation, RCW 9A.44.083, which occurred on or about July 1, 1988. The last two counts were dropped when "C" pleaded guilty to the first count. In her plea, "C" stated that:

> I let [a 5-year-old boy] lay on top of me. We were both clothed. I let him touch my breast and look inside my underwear. He also kissed my mouth.

The affidavit for probable cause contains additional allegations. First, while baby-sitting, "C" touched the young boy's penis on several different occasions. Second, while baby-sitting a 4-year-old girl, "C" removed her clothes, scratched herself in the genitals, and then proceeded to place her hand inside the young girl's underpants, rubbing her to the point of pain. Finally, while baby-sitting, "C" undressed a young boy, showed him to the other children and touched his penis.

Juvenile "D", a 16-year-old male, was charged with indecent liberties, RCW 9A.44.100(1), which occurred on or about June 2, 1988. "D" pleaded guilty and stated the following:

[An 11-year-old girl] and I went to the Lynden Middle School to get some pop. I started tickling her, and then I kissed her. We started playing around and I asked her if she wanted to go to the back of the middle school. She said yes, and we laid down and she was laughing. We played around some more. I took off her shirt and unbuttoned her pants and touched her breasts and crotch area.

The affidavit of probable cause additionally alleged that he removed his clothes, as well as her clothes. Moreover, "[h]e rubbed his genitals and hands against [her] genitals for several minutes."

Juvenile "E", a 15-year-old boy, was charged with first degree child molestation, RCW 9A.44.083, which occurred on October 13, 1988. "E" pleaded guilty, stating that he had "sexual contact" with a 7-year-old boy. According to the probable cause affidavit, the incident occurred while "E" was baby-sitting a 7-year-old boy. On three separate occasions during the evening, "E" entered the boy's room and placed his mouth on the boy's penis.

Pursuant to RCW 70.24.340(1)(a), the State sought orders from the juvenile court allowing HIV testing of all five juvenile offenders. Appellants opposed the HIV testing, alleging numerous constitutional grounds. A hearing was held before Commissioner Morrow on November 15, 1989, to determine the constitutional issues. Commissioner Morrow upheld the statute, finding it consistent with the Fourth Amendment and the right to privacy. He later issued an order directing HIV testing of the juvenile offenders, but then stayed this order pending appellate review. We accepted Division One's certification of this case.

ADJUDICATION/CONVICTION

As part of the public health chapter covering sexually transmitted diseases, RCW 70.24.340(1)(a) mandates HIV testing for all persons "[c]onvicted of a sexual offense under chapter 9A.44 RCW". Testing is to occur soon after sentenc-

ing upon an order of the sentencing judge. RCW 70.24-.340(2). All tests are to be performed by the local health department and must include both pre- and posttest counseling. RCW 70.24.340. Distribution of the test results is strictly limited to those persons with a genuine interest. RCW 70.24.105(2).

Appellants argue that RCW 70.24.340(1)(a) does not apply to juvenile sexual offenders, because the statute requires a "conviction" prior to mandatory HIV testing. Technically speaking, juveniles are not "convicted" of crimes, but rather "adjudicated" to have committed offenses. As a result, appellants contend, the Legislature's use of the word "convicted" evidences an intent to test only adult sexual offenders.

When statutory language is used in an unambiguous manner we will not look beyond the plain meaning of the words. *Everett Concrete Prods., Inc. v. Department of Labor & Indus.*, 109 Wn.2d 819, 822, 748 P.2d 1112 (1988). Unfortunately, however, such is not the case with the statute before us. The statute uses both the terms "convicted" and "offense" without differentiation. Subsection (1) of RCW 70.24.340 uses the term "convicted of", while subsection (3) states that the section applies to "offenses" — a term inclusive of both adult and juvenile crimes.[1] Furthermore, the Legislature's use of "conviction" in statutes to refer to juveniles appears to be endemic. Numerous other statutes, including sections of the Sentencing Reform Act of 1981, RCW 9.94A, and the Juvenile Justice Act of 1977, RCW 13.40, use "convicted" to reference both adult and juvenile offenders. *See, e.g.*, RCW 9.94A-.030(9) (" 'Conviction' means an adjudication of guilt".); RCW 9.94A.030(12)(b) ("Criminal history" includes a defendant's prior convictions in juvenile court.); RCW 13.40.280(4) (refers to the "convicted juvenile"); RCW 43.43.830(4) ("Conviction record" includes crimes committed while either an adult or juvenile.); RCW 46.20.342(2) (refers to the "conviction" of a juvenile); RCW 74.13.034(2) (refers to "convicted juveniles").

---

[1] Under the Juvenile Justice Act of 1977, an offense is defined as "an act designated a violation or a crime if committed by an adult under the law of this state". RCW 13.40.020(15).

In fact, several statutes use "convicted" specifically to reference juvenile sexual offenders. RCW 9.94A.360; RCW 9A.44-.130(3)(a) ("the term 'conviction' refers to adult convictions and juvenile adjudications"). It is readily apparent, therefore, that we cannot rely exclusively on the technical meaning of "convicted" to resolve this issue.[2]

Instead, it is necessary to turn to statutory construction to determine the meaning of this statute. *Morris v. Blaker*, 118 Wn.2d 133, 143, 821 P.2d 482 (1992). In accomplishing this task, our primary directive is to adopt that interpretation which best advances the statute's legislative purpose. *See, e.g., State v. Elgin*, 118 Wn.2d 551, 555, 825 P.2d 314 (1992).

The purposes of the mandatory HIV testing statute are broad:

> The legislature declares that sexually transmitted diseases constitute a serious and sometimes fatal threat to the public and individual health and welfare of the people of the state. The legislature finds that the incidence of sexually transmitted diseases is rising at an alarming rate and that these diseases result in significant social, health, and economic costs, including infant and maternal mortality, temporary and lifelong disability, and premature death.

RCW 70.24.015. By adopting this statute, the legislative intent was "to provide a program that is sufficiently flexible to meet emerging needs, deal[] efficiently and effectively with reducing the incidence of sexually transmitted diseases, and provide[] patients with a secure knowledge that information they provide will remain private and confidential." RCW 70.24.015.

■ Interpreting RCW 70.24.340(1)(a) so as to include mandatory HIV testing of juvenile sexual offenders is consistent with the statute's broad public health policies.[3] The

---

[2]Ironically, appellants' own brief for Commissioner Morrow states that "[t]he Defendants in this action have been *convicted of* a sex offense under RCW 9A.44." (Italics ours.) Clerk's Papers, at 8.

[3]The broad public health purposes of the testing statute also comport with those of the Juvenile Justice Act of 1977, RCW 13.40. *See generally* RCW 13.40-.010(2) (act seeks to protect public and "[p]rovide [for] necessary treatment, supervision, and custody for juvenile offenders").

statute potentially benefits both juveniles and society by making the offenders aware of their HIV status. *Anonymous Fireman v. Willoughby*, 779 F. Supp. 402, 417 (N.D. Ohio 1991). If a juvenile sexual offender is infected, the statute provides counseling, and an opportunity to adjust future behavior to avoid infecting others. A juvenile sexual offender who is aware of an infection might also be treated with AZT or other drugs to stall the onslaught of the disease. *Government of V.I. v. Roberts*, 756 F. Supp. 898, 903-04 (D.V.I. 1991). The victims of the juvenile sexual offender also benefit by learning whether they may have been exposed to the AIDS virus.

Excluding juvenile sexual offenders from the statute's operation would only thwart the testing statute's broad public health policies. There is no evidence that the Legislature intended to limit the effectiveness of the mandatory AIDS testing statute by narrowing its application to adult sexual offenders. Indeed, the legislative mandate to protect the health of victims, offenders, and society is better served when juvenile sexual offenders are included in RCW 70.24-.340(1)(a)'s testing provisions.

Appellants rely heavily upon a recent Attorney General opinion, AGO 23 (1991), which concluded that RCW 70.24-.340(1)(a) does not apply to juveniles. In reaching this conclusion, the AGO relied primarily upon *In re Frederick*, 93 Wn.2d 28, 604 P.2d 953 (1980), which addressed the applicability of a general criminal statute to juvenile offenders. Because the HIV testing statute "impose[d] a disability or mandatory requirement, rather than a benefit, on a juvenile," the AGO concluded that *Frederick* limits the statute's application to adult offenders. AGO 23, at 4.

■■ This reasoning is not persuasive. AGO 23 fails to recognize that the mandatory HIV testing statute is a public health law, not a criminal one. The testing statute does not define the elements of a crime, nor does anyone suggest that testing is imposed as an additional punitive measure. As such, special protections applicable to criminal statutes, like the rule of lenity, are not relevant. Moreover, the AGO misreads

*Frederick*. That case did not address the meaning of "convicted", but rather the meaning of "felony".[4] It held only that juveniles do not commit "felonies" — they commit "offenses". *Frederick*, at 30. In contrast, the HIV testing statute does not use the word "felony"; it uses the broader term "offense", which *does* apply to juveniles.

In short, the Attorney General's reliance on *Frederick* is misplaced because the concerns that motivated the analysis in that case are not present here.[5] We therefore apply our normal rules of statutory construction and construe the testing statute to include juvenile sexual offenders.

### FOURTH AMENDMENT

■ Appellants argue that taking a blood sample for an HIV test violates constitutional prohibitions against unreasonable searches and seizures.[6] *See* U.S. Const. amend. 4; Const. art. 1, § 7. There is no doubt that the nonconsensual removal of blood constitutes a Fourth Amendment search. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 616, 103 L. Ed. 2d 639, 109 S. Ct. 1402 (1989); *Schmerber v.*

---

[4]At issue was the first degree escape statute which includes the element that a person must be "detained pursuant to a conviction of a felony". RCW 9A.76.110.

[5]Application of the HIV testing statute to juveniles does not result in the type of detriments which were present in *Frederick*. First, the juvenile sexual offenders will not face additional offenses on their records, nor will they be given further detention or a monetary fine. Second, their liberty interests are only slightly impacted, given the limited intrusion of a blood test. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 625, 103 L. Ed. 2d 639, 109 S. Ct. 1402 (1989). Because it does not impose a penalty, applying HIV testing to juvenile sexual offenders does not change the nature of the "punishment to be meted out to the juvenile offender after the *commission* of the offense." *State v. Bird*, 95 Wn.2d 83, 91, 622 P.2d 1262 (1980) (Dolliver, J., dissenting); *see also State v. Schaaf*, 109 Wn.2d 1, 7-8, 743 P.2d 240 (1987).

[6]To support this proposition, appellants primarily cite federal and state cases interpreting the federal constitution. Because the parties have not briefed nor asked for an independent construction of the state constitutional provision based upon the factors established in *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986), we will interpret Const. art. 1, § 7 using the federal Fourth Amendment analysis. *Clark v. Pacificorp*, 118 Wn.2d 167, 192 n.13, 822 P.2d 162 (1991).

*California*, 384 U.S. 757, 767-68, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (1966). Nonetheless, the Fourth Amendment does not prohibit all searches, but only unreasonable ones. *Camara v. Municipal Court*, 387 U.S. 523, 528, 18 L. Ed. 2d 930, 87 S. Ct. 1727 (1967). Although reasonableness often requires the existence of probable cause or a warrant, a "showing of individualized suspicion is not a constitutional floor". *Skinner*, 489 U.S. at 624. Instead, what is reasonable "depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *Skinner*, at 619 (quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 87 L. Ed. 2d 381, 105 S. Ct. 3304 (1985)).

 For searches outside the criminal context, the Supreme Court has developed the "special needs" doctrine. This doctrine applies "when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.' " *Skinner*, at 619 (citations omitted). Such a situation existed in *Skinner*, where the Court sanctioned the use of urine and blood tests in an effort to prevent train accidents. The Court has also found special needs rendering warrant and probable cause requirements impractical in the supervision of probationers, the operation of schools, searches of highly regulated businesses, and the operation of prisons. *Skinner*, at 619-20. Numerous courts have found the special needs doctrine to be appropriate when analyzing nonconsensual HIV testing. *See, e.g., Leckelt v. Board of Comm'rs of Hosp. Dist. 1*, 909 F.2d 820, 832 (5th Cir. 1990); *Dunn v. White*, 880 F.2d 1188, 1193 (10th Cir. 1989), *cert. denied*, 493 U.S. 1059 (1990); *Anonymous Fireman v. Willoughby*, 779 F. Supp. 402, 417 (N.D. Ohio 1991); *Johnetta J. v. Municipal Court*, 218 Cal. App. 3d 1255, 1272, 267 Cal. Rptr. 666 (1990).

We agree with this approach. When evaluating nonconsensual HIV testing, this doctrine requires that we determine:

> (1) whether the blood testing scheme arises from a "special need" beyond the needs of ordinary law enforcement and (2) if so, whether the intrusion of compulsory blood testing for AIDS, without probable cause or individualized suspicion that the

AIDS virus will be found in the tested person's blood, is justified by that need.

*Johnetta J.*, 218 Cal. App. 3d at 1274.

As to the first question, several factors are relevant. First, the testing statute is not part of the criminal code; it is designed to protect the victim, the public, and the offender from a serious public health problem. Second, unlike the typical Fourth Amendment situation, the appellants are not being tested in an effort to gain evidence for a criminal prosecution. Third, a positive HIV test does not place the appellants at risk for a new conviction or a longer sentence. Finally, traditional standards which require individualized suspicion are impractical because HIV infected sexual offenders often have no outward manifestations of infection. Thus, we conclude that mandatory HIV testing of sexual offenders under RCW 70.24.340(1)(a) presents a special need. *Accord Dunn*, 880 F.2d at 1196; *Love v. Superior Court*, 226 Cal. App. 3d 736, 743, 276 Cal. Rptr. 660 (1990); *Johnetta J.*, 218 Cal. App. 3d at 1280.

The next step in the *Skinner* inquiry is to balance the individual's interest in avoiding testing against the government's interest in mandatory testing. In general, for individuals, the impact of a blood test is minimal. *State v. Meacham*, 93 Wn.2d 735, 737, 612 P.2d 795 (1980). As the Supreme Court recognized in *Winston v. Lee*, 470 U.S. 753, 762, 84 L. Ed. 2d 662, 105 S. Ct. 1611 (1985), it is "society's judgment that blood tests do not constitute an unduly extensive imposition on an individual's personal privacy and bodily integrity."[7]

When the State seeks to test a convicted criminal, the intrusion on individual interests is even more limited. *Jones v. Murray*, 962 F.2d 302, 307 (4th Cir. 1992). Although such individuals do not forfeit their rights, their constitutional prerogatives are subject to "substantial limitations and restrictions". *See Walker v. Sumner*, 917 F.2d 382, 385 (9th Cir. 1990). For sexual offenders in particular, their expectation of privacy in

---

[7] In fact, one court has observed that *Skinner* "relegate[s] blood testing to a realm of lesser protection under the Fourth Amendment." *Johnetta J.*, 218 Cal. App. 3d at 1277.

bodily fluids is greatly diminished because they have engaged in a class of criminal behavior which presents the potential of exposing others to the AIDS virus. As one commentator has explained,

> Because AIDS can be transmitted through sexual contact, there is a direct nexus between the criminal behavior and the government's action. Therefore, the offender should reasonably expect that his blood will be tested for the virus. The assailant's own actions work to weaken his expectation of privacy.

Bernadette Pratt Sadler, Comment, *When Rape Victims' Rights Meet Privacy Rights: Mandatory HIV Testing, Striking the Fourth Amendment Balance*, 67 Wash. L. Rev. 195, 207 (1992).

Despite this minimal expectation of privacy, we are nonetheless sensitive to the special concerns raised by mandatory HIV testing. Such testing presents not only the initial withdrawal of blood, but also the subsequent testing of that blood for a sexually transmitted disease. *Government of V.I. v. Roberts*, 756 F. Supp. 898, 901 (D.V.I. 1991). If the sexual offender tests positive, then he or she might suffer the well-documented gauntlet of discrimination facing infected persons. *See generally Howell v. Spokane & Inland Empire Blood Bank*, 117 Wn.2d 619, 628, 818 P.2d 1056 (1991); *Roberts*, 756 F. Supp. at 902.

These potential harms, however, are minimized in the case before us. The stigma a person faces as a result of a positive HIV test:

> is a function of how widely the results are disseminated. The risk of stigmatic harm therefore speaks not to whether the search should transpire in the first instance, but rather to the extent to which the private medical facts learned from the procedure should be disclosed.

*Roberts*, 756 F. Supp. at 902. Washington's mandatory AIDS testing statute emphasizes the importance of privacy and confidentiality. RCW 70.24.015. The statute specifically limits the disclosure of HIV test results, RCW 70.24.105(2), and appellants do not allege how this limited disclosure might harm juvenile offenders. Thus, given this limited disclosure, we conclude that the testing presents "a minimal

Fourth Amendment intrusion." *Johnetta J.*, 218 Cal. App. 3d at 1279.

In contrast, the State's reasons for testing are substantial. Most notably, the State has a compelling interest in combating the spread of AIDS. *Anonymous Fireman*, 779 F. Supp. at 416. Control of a communicable disease is a valid and compelling exercise of the State's police power. *Love*, 226 Cal. App. 3d at 740. Testing sexual offenders directly addresses this purpose. *See People v. C.S.*, ___ Ill. App. 3d ___, 583 N.E.2d 726 (1991), *appeal denied*, 602 N.E.2d 461 (1992).

The State also has an interest in protecting the rights of victims. As the *Johnetta J.* court pointed out:

> Patients are anxious to know the HIV status of the person with whom they have come into contact. *This information is useful for both the treating physician and the patient.* A positive test of the person who may have infected the patient would inform the physician that additional and more extensive monitoring of the patient's medical condition is warranted than would be the case were the results of the test negative. If the results of the HIV test of the source is negative, this information may be useful in helping to allay the concerns of the patient.

218 Cal. App. 3d at 1266 (quoting Dr. William Drew, M.D.). Where a victim is left to wonder as to an attacker's HIV status, the "mental anguish suffered by the victim . . . is real and continuing, and the intrusion upon defendant of a routine drawing of a blood sample is very minimal and commonplace." *People v. Thomas*, 139 Misc. 2d 1072, 1075, 529 N.Y.S.2d 429, 431 (Cy. Ct. 1988).

A test can also aid in effective prison and probation management by alerting officials to a sexual offender's HIV status. "The outcome of a potential source's test affects the degree to which a person should undertake precautionary measures to ensure the virus is not spread to others." *Roberts*, 756 F. Supp. at 904. Testing can prepare officials to better protect other inmates. Moreover, when HIV status is known, a prisoner can receive appropriate treatment to possibly stall the onslaught of symptoms. This helps to further the State's constitutional "obligation to provide minimally adequate

medical care to those whom they are punishing by incarceration." *Harris v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir. 1991).

The State has a further interest in aiding a sexual offender who is potentially HIV positive. By providing pre- and posttest counseling, the State can minimize the impact of HIV status on the offender and protect future victims by helping an offender to alter behavior. Although there is no cure for AIDS, this fact does not justify an enforced ignorance of HIV status. The governmental interest supporting mandatory HIV testing "outweighs the psychological impact of the assailant's receipt of a positive test for HIV." *Johnetta J.*, 218 Cal. App. 3d at 1278.

Appellants may be correct that only on occasion will testing reveal an HIV infected offender, and that an infected offender will not always pass the virus on to a victim. Nonetheless, the State's interest in testing is still substantial. Although an HIV test is not dispositive of either victim or offender HIV status, it is effective enough to justify its use. *Johnetta J.*, 218 Cal. App. 3d at 1280; *Roberts*, 756 F. Supp. at 903. Lack of perfection does not render a legislative scheme invalid. Although testing may be an ineffective use of state resources, it is not for the court to pass on the fiscal wisdom of this legislation. *Johnetta J.*, 218 Cal. App. 3d at 1285.

Appellants also argue that the statute improperly includes behavior which is incapable of passing the virus. For example, some of the cases before us involve no passing of bodily fluids. However, the Legislature has reasonably determined that sexual offenders are a high-risk group for exposing others to the AIDS virus. *See People v. C.S.*, ___ Ill. App. 3d ___, 583 N.E.2d 726, 729 (1991), *appeal denied*, 602 N.E.2d 461 (1992). The fact that the particular act for which an offender was prosecuted involved a minimal risk of exposure to HIV does not remove the State's interest in testing. First, the ambiguous nature of the contacts between offender and victim enforces the legislative judgment to test all offenders. Given the youth of the victims and the trauma imposed by the

offender, it is often difficult to learn whether bodily fluids passed during the assault. Second, a legislative desire to protect the victim, offender, and society supports testing. Sexual assaults are seldom isolated events. When an offender is finally caught, it is possible that he or she has already committed numerous other sexual assaults or may commit more assaults in the future. These contacts all potentially involve passing the AIDS virus. Finally, even though the probability of passing the AIDS virus is low, because there is no cure for AIDS, the potential harm from an infection is extremely high. *Leckelt*, 909 F.2d at 829. With all this in mind, it is within the legislative prerogative to declare mandatory testing for all members of this high-risk group.

We recognize that the constitutional arguments raised here involve highly sensitive and difficult issues. As such, we have attempted to formulate a careful and reasoned approach. Still, the concurrence/dissent claims that there is no limiting principle in the majority opinion. It asks: "what is to prevent the mandatory testing of other groups whose individual members are not charged and convicted of criminal conduct?" Concurrence/dissent, at 103. Fortunately, the question incorporates the answer. The holding in this case applies only to convicted sex offenders who, as discussed above, are subject to decreased expectations of privacy. *See supra* at 91-94. There are no other "groups" included — either explicitly or implicitly — in our holding.

In sum, we hold that the mandatory HIV testing of sexual offenders comports with the Fourth Amendment. Under *Skinner*, this testing constitutes a special need which is "obvious and compelling." *Love*, 226 Cal. App. 3d at 743; *accord Dunn*, 880 F.2d at 1193-94; *Johnetta J.*, 218 Cal. App. 3d at 1280.

### RIGHT TO PRIVACY

Appellants further argue that mandatory HIV testing violates the constitutional right to privacy. We have recognized two types of privacy: the right to nondisclosure of intimate personal information or confidentiality, and the right to autonomous decisionmaking. *O'Hartigan v. Depart-*

*ment of Personnel*, 118 Wn.2d 111, 117, 821 P.2d 44 (1991); *Bedford v. Sugarman*, 112 Wn.2d 500, 509, 772 P.2d 486 (1989). The former may be compromised when the State has a rational basis for doing so, *O'Hartigan*, at 117, while the latter may only be infringed when the State acts with a narrowly tailored compelling state interest.[8] *State v. Farmer*, 116 Wn.2d 414, 429, 805 P.2d 200, 812 P.2d 858 (1991).

Although the RCW 70.24.340(1)(a) testing scheme implicates the confidentiality branch of privacy, the intrusion is minimal due to the limited disclosure of test results. As discussed above, the intrusion on one's privacy is a direct result of how widely test results are disseminated. Here, a ·concern for confidentiality is an inextricable part of the testing scheme:

> The legislature further finds that sexually transmitted diseases, by their nature, involve sensitive issues of privacy, and it is the intent of the legislature that all programs designed to deal with these diseases afford patients privacy, confidentiality, and dignity. . . . It is therefore the intent of the legislature to provide a program that . . . provides patients with a secure knowledge that information they provide will remain private and confidential.

RCW 70.24.015. Given the strong state interest in testing, we find no conflict with this branch of privacy.

Nor do we find conflict with the autonomy branch of privacy. The nonconsensual taking of blood implicates the personal autonomy branch of privacy. *Farmer*, at 429. Nonetheless, the various compelling state interests served by RCW 70.24.340(1)(a) legitimate whatever impact it has on personal autonomy rights.[9] As discussed above, mandatory testing of sexual offenders protects society from a communicable disease, safeguards the interests of victims, facili-

---

[8]The fact that the current case involves juveniles is of no special relevance, because the rights of juveniles are prima facie coextensive with those of adults. *State v. Koome*, 84 Wn.2d 901, 904, 530 P.2d 260 (1975).

[9]Unlike the situation where the government attempts to test an innocent party, the individuals to be tested in the current case labor under a decreased expectation of privacy. *See supra* at 92-94. The right of privacy does not exist in a vacuum distinct from Fourth Amendment expectations of privacy.

tates the efficient operation of prisons, and provides opportunities to treat and counsel offenders themselves. Moreover, the statute is narrowly tailored to meet these interests because it is aimed at a high-risk group, and it limits disclosure of test results. This limited intrusion on an offender's privacy rights is permissible. *Farmer,* 116 Wn.2d at 430; *Dunn,* 880 F.2d at 1196; *Government of V.I. v. Roberts,* 756 F. Supp. 898, 903 (D.V.I. 1991); *see also Anonymous Fireman v. Willoughby,* 779 F. Supp. 402, 418 (N.D. Ohio 1991).

Thus, we hold that the testing of sexual offenders under RCW 70.24.340(1)(a) is reasonable under the Fourth Amendment because substantial governmental interests are served by testing and the disclosure of those test results to a limited group of people eclipses the defendants' interests in preventing the search. Testing is also consistent with the right to privacy. We are supported in these conclusions by a majority of other courts which have dealt with the issue.[10] We therefore affirm the commissioner, and remand the case for HIV testing of the juvenile sexual offenders.

ANDERSEN, C.J., and BRACHTENBACH, SMITH, and GUY, JJ., concur.

UTTER, J. (concurring in part, dissenting in part) — I disagree with the majority's conclusion that AIDS testing of

---

[10]*See, e.g., Leckelt v. Board of Comm'rs of Hosp. Dist. 1,* 909 F.2d 820 (5th Cir. 1990); *Dunn v. White,* 880 F.2d 1188 (10th Cir. 1989), *cert. denied,* 493 U.S. 1059 (1990); *Anonymous Fireman v. Willoughby,* 779 F. Supp. 402 (N.D. Ohio 1991); *Government of V.I. v. Roberts,* 756 F. Supp. 898 (D.V.I. 1991); *Harris v. Thigpen,* 727 F. Supp. 1564 (M.D. Ala. 1990), *aff'd in part, vacated in part,* 941 F.2d 1495 (11th Cir. 1991); *Love v. Superior Court,* 226 Cal. App. 3d 736, 276 Cal. Rptr. 660 (1990); *Johnetta J. v. Municipal Court,* 218 Cal. App. 3d 1255, 267 Cal. Rptr. 666 (1990); *People v. C.S.,* ___ Ill. App. 3d ___, 583 N.E.2d 726 (1991), *appeal denied,* 602 N.E.2d 461 (1992); *People v. Cook,* 143 A.D.2d 486, 532 N.Y.S.2d 940, *appeal denied,* 73 N.Y.2d 786 (1988); *People v. Thomas,* 139 Misc. 2d 1072, 529 N.Y.S.2d 429 (Cy. Ct. 1988). *But see Walker v. Sumner,* 917 F.2d 382, 388 (9th Cir. 1990) (reversing grant of summary judgment due to existence of disputed material fact); *Glover v. Eastern Neb. Comm'ty Office of Retardation,* 867 F.2d 461 (8th Cir.) (under facts of case, AIDS testing of social workers was unreasonable search), *cert. denied,* 493 U.S. 932 (1989).

a sex offender is constitutionally valid even when that individual has not engaged in conduct capable of transmitting the virus. I would hold that AIDS testing of sex offenders is only permissible where there is probable cause to believe that an offense has been committed involving the transfer of blood, semen, or other bodily fluid capable of transmitting the AIDS virus.

In this case, the majority abandons one of the core elements of the Fourth Amendment, significantly diminishing the protection afforded by that amendment, on the grounds that sexual offenders are a "high-risk" group for transmission of the AIDS virus. While the majority's recognition of the grave public threat posed by AIDS is admirable, it is precisely when the public need seems most dire that we must most resolutely defend those freedoms which lie at the core of our society. As Justice Thurgood Marshall so aptly reminded us:

> History teaches that grave threats to liberty often come in times of urgency, when constitutional rights seem too extravagant to endure. . . . [W]hen we allow fundamental freedoms to be sacrificed in the name of real or perceived exigency, we invariably come to regret it.

(Citations omitted.) *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 635, 103 L. Ed. 2d 639, 109 S. Ct. 1402, 1422 (1989) (Marshall, J., dissenting). Posterity will judge us not only in how effectively we as a society respond to crisis posed by the AIDS virus, but also by the extent to which we respect the liberty and dignity of our citizens as we face the challenge posed by AIDS.

## I
### THE FOURTH AMENDMENT

The majority is correct in concluding AIDS testing of sexual offenders should be analyzed under the "special needs" doctrine described by the United States Supreme Court in *Skinner*. Nonetheless, I disagree with both the majority's interpretation of the "special needs" inquiry and with its application to the facts of the present case.

## A

The Fourth Amendment to the federal constitution protects the citizens of this country against "unreasonable searches and seizures". U.S. Const. amend. 4. The touchstone of this protection is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *California v. Acevedo,* ___ U.S. ___, 114 L. Ed. 2d 619, 111 S. Ct. 1982, 1991 (1991) (quoting *Mincey v. Arizona,* 437 U.S. 385, 390, 57 L. Ed. 2d 290, 98 S. Ct. 2408 (1978)).

One of those limited exceptions is the "special needs" test described in *Skinner*. Under this test, governmental agencies may dispense with the ordinary warrant and probable cause requirements when those requirements impede the pursuit of an important governmental objective. In *Skinner*, for example, the United States Supreme Court upheld a mandatory drug testing scheme for railroad employees that did not provide for individualized suspicion prior to testing.

In describing this "special needs" analysis, the *Skinner* Court stated: "When faced with . . . special needs, we have not hesitated to balance the governmental and privacy interests to assess the practicality of the warrant and probable cause requirements". 489 U.S. at 619.[11]

The "special needs" analysis therefore focuses not only on the need for the government to undertake a particular type of search, but also upon the need for the government to undertake such a search without the ordinary warrant and probable cause requirements. In other words, it is not only the special need to search that is at issue, but also the special need to search without a warrant or probable cause.

---

[11]This focus on the warrant and probable cause requirements was echoed in the companion case to *Skinner*. In *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 103 L. Ed. 2d 685, 109 S. Ct. 1384 (1989), the Court described the test as follows: "[W]here a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion". 489 U.S. at 665-66.

The holding of *Skinner* reflects this understanding of the "special needs" analysis. In *Skinner*, the Court focused its attention on the need to test without a warrant or probable cause, not simply on the need to test in the first place. The mandatory testing program was not upheld *merely* because of the grave need to ensure public safety, but rather because warrant and probable cause requirements would have been impractical under the circumstances. After identifying the need for safety, the Court described its inquiry: "The question that remains, then, is whether the Government's need to monitor compliance with these restrictions justifies the privacy intrusions at issue absent a warrant or individualized suspicion." 489 U.S. at 621.

In applying the test to the warrant requirement, the *Skinner* Court balanced the private interests in a warrant requirement against the impact such a requirement would have on the pursuit of public safety. In particular, the Court directed its inquiry to the extent to which a warrant requirement would "frustrate the governmental purpose behind the search.' " 489 U.S. at 623 (quoting *Camara v. Municipal Court*, 387 U.S. 523, 533, 18 L. Ed. 2d 930, 87 S. Ct. 1727 (1967)). *See also Schmerber v. California*, 384 U.S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (1966) (*warrantless* blood test for alcohol permissible because delay would allow alcohol to be physically absorbed, thus destroying evidence). After weighing these interests, the Court concluded the warrant requirement would be impractical under the circumstances.

The Court analyzed the probable cause requirement in similar fashion by asking whether such a requirement would place the government's interest "in jeopardy". 489 U.S. at 624. Ultimately, the *Skinner* Court dispensed with the probable cause requirement because "[i]t would be unrealistic, and inimical to the Government's goal of ensuring safety in rail transportation, to require a showing of individualized suspicion in these circumstances." 489 U.S. at 631.

This distinction between policy analysis of the testing itself and analysis of the warrant and probable cause requirements is more than a distinction without a difference. Simply

because a pressing need for testing exists does not mean that a pressing need for testing without a warrant or probable cause exists. In *Barlow v. Ground*, 943 F.2d 1132 (9th Cir. 1991), for example, the Ninth Circuit held an otherwise reasonable search invalid for failure to obtain a warrant. The plaintiff, Barlow, had bitten two police officers during his arrest. Concerned about the possibility of AIDS, the police administered a nonconsensual blood test without a warrant. Later, the police attempted to justify the search on safety and health grounds. The Ninth Circuit rebuffed their efforts. It noted that "[i]t makes no difference to the officers' health whether Barlow was tested immediately, without a warrant, or a short time later pursuant to a warrant." 943 F.2d at 1139. Therefore, the police could show no reason for an immediate, *warrantless* search.

The *Skinner* framework thus appears clear enough. Even after the identification of a "special need", the Fourth Amendment requires a demonstration that a warrant or probable cause requirement is impractical. The "special needs" balancing should therefore compare the *effect* of such requirements on both an individual's privacy interests and upon the pursuit of the government's "special need".

## B

The majority, however, applies a different version of this analysis. According to the majority, the essence of the "special needs" inquiry is "to balance the individual's interest in avoiding testing against the government's interest in mandatory testing." Majority opinion, at 92. In stating the inquiry in this fashion, the *Skinner* analysis of the practicality of the probable cause requirement is mistaken for a policy evaluation of the need for the testing itself.

The majority's analysis of the competing interests at stake tracks its understanding of the "special needs" analysis. After discussing the "minimal Fourth Amendment intrusion" of blood testing, the majority describes the State's interests in testing. These interests are "a compelling interest in combating the spread of AIDS", majority opinion, at

94, "protecting the rights of victims", majority opinion, at 94, "effective prison and probation management", majority opinion, at 94, and providing assistance to HIV-positive sex offenders, majority opinion, at 95.

As I outline in section C below, I do not believe these interests justify the sort of broad-gauged testing authorized by RCW 70.24.340. At this stage, however, the important analytic point is that none of these interests speak to the *impracticality of probable cause*. Each of these interests may provide justification for a testing program, even a nonconsensual testing program, but they do not explain a testing program without probable cause.

Following its "special needs" analysis, the majority does attempt to defend the statute's disturbing omission of probable cause. Principally, it argues that "the Legislature has reasonably determined that sexual offenders are a high-risk group for exposing others to the AIDS virus." Majority opinion, at 95. In essence, even if there is no reason to believe that a sexual offender transmitted bodily fluids in this particular instance, it is reasonable to assume they did so in the past (or will do so in the future) and therefore we can force them to undergo a test.

I cannot accept the logical implications of such a view. In essence, the majority has concluded that the Legislature need merely make a "reasonable determination" of risk in order to require mandatory testing. In this case, that determination means the mandatory testing of sex offenders. The majority's rationale, however, could be extended much further. If all the Legislature must do is make a "reasonable determination" of risk in order to require testing, what is to prevent the mandatory testing of other groups whose individual members are not charged and convicted of criminal conduct? Because I perceive no limiting principle to the majority's analysis, I cannot accept its reading of the Fourth Amendment. While the majority does specifically limit its holding, the inescapable implications to be drawn from the holding cannot be so limited.

Fourth Amendment "special needs" analysis should be based on the practicality of a probable cause requirement and not our "assumptions" about whether individuals may or may not be dangerous. In *Skinner*, drug testing without probable cause was allowed because it would have been impractical, not because Congress "reasonably assumed" railway employees to belong to a "high-risk" group.

The majority also attempts to defend the breadth of the statute due to the "ambiguity" of the contacts between offender and victim. Majority opinion, at 95-96. In this respect, it is useful to remember we are not considering *proof*, but merely probable cause. To require testing, the authorities would not need to prove transmission, but merely establish probable cause. Furthermore, the type of finding required by probable cause would be no different from a multitude of the factual findings we expect our trial courts to make daily.

## C

Even if we accept the majority's view of "special needs" analysis, the interests it identifies are insufficient to justify the broad-gauged mandatory testing it seeks to uphold.

First, the majority argues "the State has a compelling interest in combating the spread of AIDS." Majority opinion, at 94. This argument, like the justification for the statute's lack of probable cause, proves too much. If "combating the spread of AIDS" is compelling and blood tests are only minimally intrusive,[12] then conceivably the Legislature can constitutionally choose to require mandatory testing for *any* individual whether charged and convicted or not.

The majority next argues "[t]he State also has an interest in protecting the rights of victims." Majority opinion, at 94. It points out, appropriately, that victims left to wonder about their attacker's HIV status suffer real mental anguish. This

---

[12]"[I]t is 'society's judgment that blood tests do not constitute an unduly extensive imposition on an individual's personal privacy and bodily integrity.'" Majority opinion, at 92 (quoting *Winston v. Lee*, 470 U.S. 753, 762, 84 L. Ed. 2d 662, 105 S. Ct. 1611 (1985)).

concern is completely misplaced, however, in cases where there is no possibility of HIV infection. When there is no possibility of infection, the State's interest in protecting the victim of a sexual offender from AIDS is no greater than its interest in protecting the victim of a mugger or an automobile thief whose offense poses no possibility of HIV infection. Most importantly, such an interest cannot be said to be generally compelling. Such an interest would be compelling where there was a possibility of infection, as in the case where there was probable cause to believe there was a transmission of bodily fluids.

The majority also argues testing can "aid in effective prison and probation management by alerting officials to a sexual offender's HIV status." Majority opinion, at 94. It may be true that knowledge of the HIV status of prison inmates might serve the compelling state interest in prison management; however, the testing authorized by RCW 70.24.340(1)(a) is not associated in any fashion with incarceration.[13] In fact, RCW 70.24.340 clearly requires testing when there is no possibility of incarceration.

The majority's concern with probation management is also unpersuasive. The majority does not explain how knowledge that a given individual is HIV positive will substantially assist a probation officer in the performance of his or her duties. While it is true that any information about a probationer may be useful to a probation officer, that alone does not indicate the presence of a compelling state interest.

Lastly, the majority contends "[t]he State has a further interest in aiding a sexual offender who is potentially HIV positive." Majority opinion, at 95. Again, this type of argument proves too much. The State's interest in assisting a sexual offender who is potentially HIV positive is no greater than its interest in assisting any other sort of criminal

---

[13]Furthermore, the limitation of the statute to sexual offenders suggests that prison management was not in fact the concern motivating the Legislature in enacting RCW 70.24.340(1)(a).

offender. Unless we are prepared to permit the Legislature to demand mandatory testing of all criminal offenders, we cannot accept the state interest put forth by the majority as compelling.

## D

I believe an appropriate application of the "special needs" test would require the existence of probable cause to believe that transmission of bodily fluids occurred before nonconsensual HIV testing could take place.

The first step is to evaluate the individual's interest in a probable cause requirement. In doing so, we should be mindful of the invasiveness of an AIDS test. Although the United States Supreme Court has indicated that in some instances extraction of blood is minimally invasive for Fourth Amendment purposes,[14] AIDS testing is different. First, the analysis of an individual's blood compromises the individual's privacy interest in his or her medical condition. This court has repeatedly emphasized that individuals have an important privacy interest in medical information. *Howell v. Spokane & Inland Empire Blood Bank*, 117 Wn.2d 619, 628, 818 P.2d 1056 (1991); *Bedford v. Sugarman*, 112 Wn.2d 500, 509-10, 772 P.2d 486 (1989).[15]

More importantly, AIDS testing, unlike blood alcohol or drug testing, can have a devastating impact on an individual's life. *See* Comment, *When Rape Victims' Rights Meet Privacy Rights: Mandatory HIV Testing, Striking the Fourth Amendment Balance*, 67 Wash. L. Rev. 195, 208-09 (1992). The psychological impact on the individual has been com-

---

[14]*See, e.g., Skinner*, 489 U.S. at 625, 109 S. Ct. at 1417 (blood, breath, and urine tests for drugs and alcohol not intrusive).

[15]Even those incarcerated in prison retain a significant privacy interest in their medical information. *See Nolley v. County of Erie*, 776 F. Supp. 715, 731 (W.D.N.Y. 1991) (holding prison inmates have a constitutional right to privacy that includes protection from unwarranted disclosure of their HIV status). *John Doe v. Coughlin*, 697 F. Supp. 1234 (N.D.N.Y. 1988) (prison inmate has a right to privacy in his AIDS diagnosis); *Woods v. White*, 689 F. Supp. 874 (W.D. Wis. 1988) (individual who had been convicted and imprisoned retains constitutional right to privacy), *aff'd*, 899 F.2d 17 (7th Cir. 1990).

pared to a death sentence. *People v. Thomas,* 139 Misc. 2d 1072, 1075, 529 N.Y.S.2d 429, 431 (Cy. Ct. 1988); *see also Glover v. Eastern Neb. Comm'ty Office of Retardation,* 686 F. Supp. 243, 248 (D. Neb. 1988) (describing patients' reactions to a positive AIDS test as "devastation" that may lead to suicide), *aff'd,* 867 F.2d 461 (8th Cir.), *cert. denied,* 493 U.S. 932 (1989).

The social consequences can be equally devastating. A positive AIDS test may lead to discrimination in employment, education, housing, and medical treatment. *Howell v. Spokane & Inland Empire Blood Bank,* 117 Wn.2d 619, 628, 818 P.2d 1056 (1991); Note, *Compulsory AIDS Testing of Individuals Who Assault Public Safety Officers: Protecting the Police or the Fourth Amendment?,* 38 Wayne L. Rev. 461, 481 (1991-1992). The impact of a positive AIDS test on all aspects of a person's life is severe. Thus, individuals have a strong interest in restricting mandatory government AIDS testing. The probable cause requirement serves to protect this interest by limiting the opportunity for government imposed testing to those circumstances when transmission of the AIDS virus is possible.

The need for the probable cause requirement is not minimized by the provisions for limited disclosure in RCW 70.24-.105. The extent of disclosure does not diminish the psychological shock of a positive AIDS test. The long list of those other than the victim who can obtain the test results — state or local public health officers, claims management personnel, social services workers, and anyone who can demonstrate good cause, only to name a few — indicates that disclosure may not in fact be so limited. Even with limited disclosure, an inherent difficulty in keeping test results confidential remains. *See* Note, *AIDS, Rape, and the Fourth Amendment: Schemes for Mandatory AIDS Testing of Sex Offenders,* 43 Vand. L. Rev. 1607, 1633 (1990) (noting that many believe that there are too many opportunities for disclosure even where disclosure is restricted). One leak can have devastating consequences for an individual's privacy. *Jane Doe v. Barrington,* 729 F. Supp. 376, 378-79 (D.N.J.

1990) (disclosure of Doe's HIV-positive status by police officer to a neighbor culminated in a maelstrom of public hysteria).

With respect to the government's interest, a probable cause requirement would not be impractical under the circumstances. While I agree the State has a powerful interest in protecting the victims of sexual offenders from AIDS,[16] AIDS is transmitted "only by contact of open wounds or body cavities with blood, semen, or vaginal secretions — usually in sexual relations, by infusion or innoculation [*sic*] of blood in transfusions or intravenous needle-sharing activities or prenatally." *Harris v. Thigpen*, 727 F. Supp. 1564, 1567 (M.D. Ala. 1990), *aff'd in part, vacated in part*, 941 F.2d 1495 (11th Cir. 1991); *see also* Friedland & Klein, *Transmission of the Human Immunodeficiency Virus*, 317 New Eng. J. Med. 1125, 1132 (Oct. 29, 1987) (noting that "[o]nly blood and semen have been directly implicated in transmission, and transmission by vaginal fluid and breast milk probably occurs"). Thus, the State's interest in protecting the victim of sexual assaults from AIDS is only implicated where there was a transmission of bodily fluids.

The Eighth Circuit has recognized the limited nature of the State's interest in this regard. In *Glover v. Eastern Neb. Comm'ty Office of Retardation*, 867 F.2d 461 (8th Cir.), *cert. denied*, 493 U.S. 932 (1989), that court held nonconsensual AIDS testing was unconstitutional where the risk of transmission was negligible or nonexistent. A Nebraska administrative agency had created a personnel policy requiring certain employees who serviced the needs of the retarded to submit to mandatory AIDS testing. The Eighth Circuit held that the risk of transmission to the agency's mentally retarded clients was negligible and therefore did not justify requiring employees to submit to an AIDS test. 867 F.2d at 464. Compare *Leckelt v. Board of Comm'rs of Hosp. Dist. 1*, 909 F.2d 820 (5th Cir. 1990) (mandatory testing permissible where nurse

---

[16]As I have discussed above, the court upholds the statute on the broader grounds of limiting the spread of AIDS, as well as the "reasonable assumption" that sexual offenders are "high risk" to spread AIDS. As I have already detailed my dissatisfaction with those grounds, I will not repeat my comments here.

that lived with AIDS patient had repeated opportunities to exchange bodily fluids with patients). *See also* Note, *Compulsory AIDS Testing of Individuals Who Assault Public Safety Officers: Protecting Police or the Fourth Amendment?*, 38 Wayne L. Rev. 461, 479 (1991-1992) (arguing that AIDS testing only meets constitutional standards when an individual's conduct creates "a genuine risk of AIDS transmission").

Significantly, all of the cases cited by the majority where AIDS testing of sexual offenders has been approved involved the passage of bodily fluids. *See People v. Thomas,* 139 Misc. 2d 1072, 529 N.Y.S.2d 429 (Cy. Ct. 1988) (ordering blood test where sexual intercourse and oral sodomy); *People v. Cook,* 143 A.D.2d 486, 532 N.Y.S.2d 940 (ordering AIDS test of convicted rapist), *appeal denied,* 73 N.Y.2d 786 (1988); *Government of V.I. v. Roberts,* 756 F. Supp. 898 (D.V.I. 1991) (ordering testing of rapist). A legitimate concern for the psychological and physical well-being of the victims in these cases led to an approval of the test.

The probable cause requirement also does not impede the government's objectives because trial courts are perfectly capable of making a finding as to whether or not bodily fluids passed. *See Johnetta J. v. Municipal Court,* 218 Cal. App. 3d 1255, 1280, 267 Cal. Rptr. 666, 681 (1990) (holding that testing of a person who assaults a police officer is valid "if there is *probable cause* to believe the officer has been exposed to the assailant's bodily fluids"). (Italics mine.) Trial courts can make this determination, allowing testing where there is probable cause to believe the assailant committed an act which poses a risk of exposing a victim to the AIDS virus.

Given the strong individual interest in the probable cause requirement, and the absence of important reasons to dispense with that requirement, I do not find such a requirement impractical under the circumstances. Consequently, I would limit mandatory AIDS testing to cases where there is probable cause to believe transmission of bodily fluids took place.

## II
### PRIVACY

An analysis of the constitutional privacy issues in this case compels the same result.

The majority correctly notes that there are two types of privacy: the right to nondisclosure of personal information and the right to autonomous decisionmaking. *Bedford v. Sugarman*, 112 Wn.2d 500, 509, 772 P.2d 486 (1989). I disagree with the majority's conclusion that rational basis review is appropriate in evaluating the informational privacy claim. *See Thorne v. El Segundo*, 726 F.2d 459, 470 (9th Cir. 1983), *cert. denied*, 469 U.S. 979 (1984); *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570 (3d Cir. 1980); *O'Hartigan v. Department of Personnel*, 118 Wn.2d 111, 127-28, 821 P.2d 44 (1991) (Utter, J., concurring in part, dissenting in part); *see also* Note, *The Constitutional Protection of Informational Privacy*, 71 B.U.L. Rev. 133, 135 (1991) (arguing infringements in informational privacy implicate a fundamental right and should be subjected to intermediate scrutiny). Using rational basis review is particularly inappropriate because an individual's privacy interest in his or her HIV status is great, given the sensitivity of the information. *See* L. Tribe, *American Constitutional Law* § 15-16, at 1394-95 (2d ed. 1988) (noting the devastating consequences of disclosure).

Nonetheless, it is unnecessary to inquire at length as to whether AIDS testing of offenders where no bodily fluids have passed violates informational privacy, because it violates the other aspect of privacy, the right to personal autonomy. The nonconsensual taking of blood for AIDS testing implicates the personal autonomy branch of privacy, which is a fundamental right triggering strict scrutiny. *State v. Farmer*, 116 Wn.2d 414, 429, 805 P.2d 200 (1991).

Although the majority does acknowledge that strict scrutiny is appropriate for analyzing the autonomy rights of privacy, it fails to apply that test correctly. Therefore, it reaches the erroneous conclusion that AIDS testing is appropriate even where there is no passage of bodily fluids.

The majority correctly notes that where the State invades an individual's privacy, it has the burden of showing a compelling governmental interest that justifies the invasion, that the means used are narrowly tailored to meet that interest. Majority, at 96-97. In addition, the impact on a

fundamental right cannot be unduly burdensome, *i.e.*, government must use a less intrusive or restrictive method to achieve its interest where possible. *See Winston v. Lee*, 470 U.S. 753, 766-67, 84 L. Ed. 2d 662, 105 S. Ct. 1611, 1619-20 (1985) (no need to retrieve bullet from defendant's body where other substantial evidence available to convict him); *Zablocki v. Redhail*, 434 U.S. 374, 389, 54 L. Ed. 2d 618, 98 S. Ct. 673 (1978) (holding restriction on marriage unconstitutional where a state had other, less onerous means to realize its interests); *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 456, 53 L. Ed. 2d 867, 97 S. Ct. 2777 (1977) (holding the Presidential Recordings and Materials Preservation Act represented the least intrusive manner to promote the government's interest).

The State's interest in notifying the victim is compelling, and the means are narrowly tailored to achieve that end. Although it might be argued that testing the victim would be less intrusive than the offender, I reject that argument because of the long latency period before the virus could be detected in the victim.[17]

If the victims in this case have not suffered a contact that poses a risk of transmitting AIDS, the State's sole residual interest is in limiting the spread of the virus.[18] Though this may be a compelling interest, nonconsensual AIDS testing is

---

[17]A newly infected victim will not test positive until at least 6 to 12 weeks after the date of exposure, and possibly longer. Blumberg, *Transmission of the AIDS Virus Through Criminal Activity*, 25 Crim. L. Bull. 454, 460 (1989).

[18]The other reasons listed by the majority, the management of correctional facilities and aiding the offender, are not legitimate, and do not merit consideration.

First, because it is unclear from the record that the juveniles are or will be in a correctional facility, this is not a legitimate reason for allowing the test. In addition, the State has not argued that a correctional facility in the state will actually use this information for any valid purpose.

Second, the State's interest in the offender's well-being is severely limited, given the degree of intrusion into the individual's right of privacy and right to be free from bodily invasion. *See In re Colyer*, 99 Wn.2d 114, 120, 660 P.2d 738 (1983) (recognizing a terminally ill patient's constitutional right of privacy that encompasses the right to refuse treatment). In addition, the State can utilize a less intrusive means, through counseling and education, to achieve its interest in assisting the offender.

neither narrowly tailored nor the least intrusive means for the State to realize this interest.

First, the mechanism the State has chosen to further its interest is not narrowly tailored. There is no evidence that the juveniles here are part of a high-risk group. Certainly their conduct prior to the offenses they committed does not so indicate. The majority simply accepts the Legislature's sweeping judgment that all of those who are convicted of committing sex offenses should be tested. The majority's approach is more consistent with rational basis review, not the strict scrutiny we must apply when a fundamental right, such as privacy, is impacted.

In addition, because AIDS testing infringes on a fundamental right, the State is obliged to use means which are the least destructive of individual liberty to achieve its goal. Other less intrusive means exist for the State to realize its interest in checking the spread of the AIDS virus. For example, the counseling already provided for in RCW 70.24.340(1) is an unintrusive way for the State to achieve its interest. Counseling can teach offenders about the AIDS virus and the risks of contracting or transmitting it.

Therefore, in the absence of a transfer of bodily fluids that poses a risk of transmitting AIDS, the State has failed to demonstrate that AIDS testing is either narrowly tailored or the least intrusive means for realizing its interest.

### III
#### CONCLUSION

I would remand this case to the trial court to determine whether there was probable cause that any of these juvenile offenders passed bodily fluids to their victims that could give rise to the AIDS virus. An AIDS test should only be performed if the trial court determines that such contact did occur.

JOHNSON, J., concurs with UTTER, J.

Reconsideration denied April 29, 1993.