FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
MARCH 27, 2025

CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
MARCH 27, 2025

SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 102942-0 |
|  | ) |  |
| Respondent, | ) |  |
| v. | ) |  |
|  | ) |  |
| JASPER JAMES NELSON, | ) |  |
|  | ) | Filed: March 27, 2025 |
| Petitioner. | ) |  |
|  | ) |  |

YU, J. — This case involves a preenforcement challenge to community custody conditions requiring petitioner Jasper Nelson to submit to "breath analysis" (BA) and "urinalysis" (UA) testing to monitor his compliance with other conditions prohibiting the use of alcohol and nonprescribed drugs. Nelson concedes that the conditions prohibiting alcohol and drug use are statutorily authorized and constitutionally valid, although they are not crime related. Nevertheless, he asks us to prohibit the State from monitoring his compliance with those conditions through BA and UA testing, citing article I, section 7 of the

Washington Constitution and *State v. Olsen*, 189 Wn.2d 118, 399 P.3d 1141 (2017).

There is no indication that Nelson has ever been asked to submit to BA or UA testing, and these conditions played no role in his special sex offender sentencing alternative (SSOSA) revocation. We do not know what facts might trigger enforcement of these conditions that he submit to such testing and it is worth noting the conditions do not say random or routine testing. Moreover, Nelson is in total confinement, and he will not begin serving his term of community custody for several years. As a result, further factual development is needed to evaluate his claims.

Ordinarily, under these circumstances, we would not grant review in a preenforcement challenge due to our ripeness doctrine. Nevertheless, we are cognizant of the conflicting opinions in the divisions of the Court of Appeals and we believe answering the question of whether a condition that authorizes BA and UA testing to monitor compliance with statutorily authorized conditions prohibiting alcohol and drug use is constitutionally permitted, even if it is not crime related, will be helpful in resolving the conflict. Thus, we affirm the Court of Appeals.

FACTUAL BACKGROUND

Jasper Nelson was 19 years old when he ran away with a 12-year-old girl named A.S.J. A.S.J.'s mother had reported her daughter missing after finding a note left by A.S.J. that expressed thoughts of suicide. A.S.J.'s mother contacted law enforcement and expressed her concerns with her daughter's relationship with Nelson and her belief that it may be sexual in nature. The Stevens County Sheriff's Office worked with Kettle Falls Middle School in attempting to locate A.S.J. by contacting friends of both Nelson and A.S.J. In doing so, the officers discovered a Zoom call that occurred between Nelson and another friend.

A Stevens County detective was sent to the friend's home to attempt personal contact, and the detective explained to the friend and his mother that he was looking for A.S.J and for information about a Zoom call with Nelson. The friend admitted to knowing both Nelson and A.S.J. but denied knowing where they were. However, the friend volunteered to retrieve his phone to help the police in locating Nelson and A.S.J. Based on the friend's nervous demeanor, the detective and the friend's mother eventually followed the friend. When they caught up with him, the mother took her son's phone and handed it to the detective, pointing out a text exchange in which Nelson had mentioned having sex with A.S.J. and her possibly being pregnant. In another text, Nelson told his friend not to let police know where he and A.S.J. were hiding. At this point, the friend admitted that

3

A.S.J. and Nelson had been hiding in the area for several hours and that he had warned them to leave when he went to get his phone. Several more officers were called in to assist in searching the area, and they were able to find A.S.J. a short time later. Nelson was not located.

The following morning, the friend's mother contacted police to report that Nelson had returned to her home and would be waiting for them. Nelson was arrested and taken to the Stevens County detective's office, where he was placed in an interview room and advised of his rights, and he agreed to a recorded interview. He admitted to initiating sex with A.S.J. four separate times and acknowledged that he was aware of her age. Further, Nelson explained that he knew that it was illegal because he had actually looked up the legal age of consent. In a separate interview, A.S.J corroborated his statements and told detectives that she and Nelson had sex three times.

When Nelson was asked if there were any other incidents, he admitted to soliciting sex from an 11-year-old girl named J.W., who is a classmate of A.S.J.'s. Approximately one month later, the Stevens County Sheriff's Office conducted a child forensic interview with J.W., who told the interviewer that she knew Nelson and that he was aware she was 11 years old. J.W. mentioned that Nelson lied about his age several times and that when she confronted Nelson about their age difference, he told her "it was fine as long as no one found out." Clerk's Papers

(CP) at 47-48. J.W. explained that Nelson "would text her on snapchat asking to hook up" and, when they got together, he "would play with his dick" in front of her. *Id.* at 47. Nelson had also touched her thigh, very close to her vaginal area. Her statements were later corroborated by Nelson during his presentence interview with the Department of Corrections (DOC), in which he admitted that he messaged J.W. on social media, hung out with her a few times, and lied about his age.

## PROCEDURAL HISTORY

A. SSOSA imposed at sentencing

Nelson pleaded guilty to the amended charges of three counts of third degree rape of a child, communication with a minor for immoral purposes, and second degree child molestation.[1] The following month, the State, joined by Nelson and the DOC, asked the sentencing court to impose a SSOSA. The State argued a SSOSA was appropriate based on (1) Nelson's "significant developmental delay," (2) Nelson's "accepting responsibility" for his actions, (3) "ensur[ing] the convictions for the[] victims," and (4) Nelson's "lack of criminal history." Suppl.

---

[1] Nelson was originally charged with three counts of rape of a child in the second degree for his offenses against his first victim, A.S.J. The State and Nelson negotiated a plea deal that would allow Nelson to benefit from a SSOSA by reducing the charges from second degree rape of child to third degree rape of a child. The State also amended the information to add one count of communication with a minor for immoral purposes and one count of second degree child molestation for Nelson's offenses against J.W., his second victim.

Verbatim Reps. of Proc. (VRP) (May 4, 2021) at 12, 14, 15, 17-18, 19. The

sentencing court followed the agreed recommendation and imposed the SSOSA.[2]

Nelson's 87-month concurrent sentence was suspended on conditions that he

be placed on community custody, engage in sex offender treatment for 5 years, and

report for annual SSOSA review hearings. His community custody conditions

include performing all affirmative acts as required by DOC to confirm compliance

with the orders of the court and following all conditions as outlined in Appendix H,

attached to the judgment and sentence.

Appendix H includes the conditions prohibiting Nelson from using

controlled substances without a prescription, consuming alcohol, and using

cannabis without medical authorization. To monitor Nelson's compliance with

these alcohol- and drug-related conditions, Appendix H includes the BA and UA

testing conditions at issue on review:

> (13) Submit to breathalyzer testing or any other testing to ensure no
> alcohol consumption.
> ….
> (27) Submit to urinalysis testing or other testing to ensure drug-free
> status.

CP at 73-74.

---

[2] Sentencing courts are authorized by the Sentencing Reform Act of 1981 to impose a
SSOSA in which a sex offender's felony sentence is suspended if certain eligibility requirements
are met. RCW 9.94A.670(2); *State v. Sims*, 171 Wn.2d 436, 439, 256 P.3d 285 (2011).

The sentencing court remarked that "thankfully . . . there was no indication of drugs or alcohol" in Nelson's life. Suppl. VRP (May 4, 2021) at 27. However, neither Nelson nor his attorney raised any objections to the BA and UA testing conditions at the time of sentencing or during the pendency of his SSOSA. To the contrary, at the commencement of his SSOSA, Nelson personally signed a DOC agreement that outlined his full list of community custody conditions, including the BA and UA testing conditions at issue on review.

B.      Nelson's SSOSA violations and SSOSA revocation

The State received Nelson's first "Notice of Violation" (NOV) from the DOC five months after sentencing. The NOV outlined that Nelson admitted to "access[ing] his mother's computer four or five times," in violation of a condition prohibiting Nelson "from using any electronic or communication device not reported and specifically approved by DOC." Suppl. CP at 110. Upon receipt of the NOV, the State moved for a hearing to address this violation.

At the hearing, Nelson stipulated to the violation alleged in the NOV, as well as a second violation of "accessing some inappropriate web content on a later date," which defense counsel noted on the record. Suppl. VRP (Dec. 7, 2021) at 52, 57. The State, Nelson, and the DOC all agreed in recommending a sanction of 30 days on electronic home monitoring, which the trial court imposed. In addition,

the court granted the State's request to prohibit Nelson from using or possessing a cell phone with Internet capabilities unless approved by the DOC.

No further violations were reported before Nelson's annual SSOSA review hearing, which occurred six months after his NOV hearing. At the review hearing, Nelson's sex offender treatment provider submitted a written statement explaining Nelson's compliance with his treatment, and Nelson's community corrections officer (CCO) reported there had been no further issues since the last hearing. The trial court signed an order acknowledging Nelson's compliance with his treatment conditions and set his next annual SSOSA review hearing for the following year. However, less than one month later, Nelson was arrested and taken into custody on new allegations of violating his SSOSA. The new allegations were detailed in two NOVs, which the State received a few days apart.

The first NOV alleged that Nelson had committed three violations of his community custody conditions by possessing an Internet capable device, accessing social media, and accessing sexually explicit materials. The allegations were based on the CCO's investigation of an unauthorized, Internet-capable tablet that had been confiscated from Nelson's work locker. The CCO found numerous searches for pornographic websites and several sexually inappropriate text messages sent by Nelson to his biological mother and sister. Nelson's sister told the CCO that nearly every conversation with him leads back to sex and that he has made sexually

inappropriate statements in front of her four-year-old child while on a video chat. The State moved for a hearing to address the new violations, seeking modification and/or revocation of the suspended sentence.

Eight days later, the State received a second NOV alleging that Nelson had committed three additional violations by continuing to access the Internet without approval, failing to notify his CCO and treatment provider of his sexual activities, and failing to include serious relationship partners in the treatment plan. According to the second NOV, Nelson "admitted that he may have impregnated a girl who . . . is still attending high school," but he had not informed his CCO or treatment provider. Suppl. CP at 146.

At the revocation hearing, Nelson stipulated to each of the six violations alleged by the DOC. Both the State and the DOC recommended revoking his SSOSA based on these violations. Nelson's attorney argued against revocation, asking for "six months in the county jail, and ramp[ing] up the treatment" to give Nelson "an opportunity . . . to try and change his behavior." Suppl. VRP (July 12, 2022) at 82. Nelson's sex offender treatment provider explained that he had spent significant time discussing each of the conditions in Nelson's judgment and sentence with him, and the consequences of violating them, in order to accommodate Nelson's intellectual deficits. However, the treatment provider was unaware of any of the alleged violations because Nelson had not told him. The

9

treatment provider informed the court that he cannot work "with somebody who's not willing to be candid." *Id.* at 84.

After hearing from the State, the DOC, Nelson, and Nelson's treatment provider, the trial court revoked Nelson's SSOSA. The trial court stated in its oral ruling that the basis for revocation was "the breadth of the[] violations, the number of violations over the period of time, the lack of progress, really, . . . [and] the lack of any hope for continuing progress." *Id.* at 89-90. Nelson then filed a timely notice of appeal from the order revoking his SSOSA.

C.      Nelson's appeal of his SSOSA revocation

On appeal, Nelson argued (1) that he was denied his constitutional right to due process in the revocation of his SSOSA, (2) that his total sentence exceeds the statutory maximum, and (3) that 14 of his community custody conditions are not crime related, are unconstitutional, or are otherwise not statutorily authorized. Relevant to this court's review, Nelson argued that because "alcohol or controlled substances played no role in the underlying offense[s]," the BA and UA testing conditions "impermissibly interfere with [his] constitutional right to privacy." Br. of Appellant at 61, 63 (Wash. Ct. App. No. 39110-8-III (2023)) (citing *State v. Greer*, No. 78291-6-I, slip op. at 22 (Wash. Ct. App. Nov. 18, 2019) (unpublished), https://www.courts.wa.gov/opinions/pdf/782916.pdf, *review denied*, 195 Wn.2d 1011 (2020)).

The State conceded that the length of Nelson's community custody term must be reduced to comply with the statutory maximum and that certain conditions should be stricken or clarified. However, the State opposed Nelson's due process claim on the merits. Additionally, the State argued that Nelson's challenge to the BA and UA testing conditions (and numerous other conditions) was not preserved for appeal or ripe for review. Further, the State argued that Nelson's challenge to the BA and UA testing conditions should be rejected "because he rests his argument entirely on" Division One's unpublished opinion in *Greer*, No. 78291-6-I. Resp't's Br. at 17 (Wash. Ct. App. No. 39110-8-III (2023)).

In its unpublished opinion, Division Three rejected Nelson's due process claim and affirmed the revocation of his SSOSA. The Court of Appeals accepted the State's concessions to correct the length of Nelson's sentence and strike certain community custody conditions. As to the remaining conditions, the Court of Appeals acknowledged the State's argument that Nelson's challenges were not ripe or preserved for review. Nevertheless, the Court of Appeals summarily stated that a "review of Mr. Nelson's challenges and the existing record persuades us that we should exercise our discretion in favor of reviewing his many challenges." *State v. Nelson*, No. 39110-8-III, slip op. at 13 (Wash. Ct. App. Feb. 13, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/391108_unp.pdf.

11

On the merits of Nelson's challenge to the BA and UA testing conditions, the Court of Appeals held that under *Olsen*, the conditions are valid because they are imposed to monitor compliance with valid probation conditions. As to the other challenged conditions, the Court of Appeals evaluated Nelson's arguments on the merits and held that certain conditions must be either stricken or modified. The Court of Appeals subsequently denied Nelson's motion for reconsideration on his due process claim.

Nelson sought review from this court as to (1) whether his SSOSA was revoked in violation of due process and (2) whether the BA and UA testing conditions violate his "constitutional right to privacy" where "[t]here is no evidence drugs or alcohol contributed to Mr. Nelson's offenses." Pet. for Rev. at 1-2. We granted review solely on the issue of the community custody conditions.

ISSUES

A.     Is Nelson's challenge to the BA and UA testing conditions ripe for review?

B.     Are community custody conditions that authorize BA and UA testing to monitor compliance with statutorily authorized conditions prohibiting alcohol and drug use constitutionally permitted, even if it is not crime related?

ANALYSIS

A.    Nelson's preenforcement challenge to the BA and UA testing conditions is
       not ripe for review

Before reaching the merits, we must resolve the threshold issue of whether

Nelson's preenforcement challenge to the BA and UA testing conditions is ripe.

Although the Court of Appeals "exercise[d its] discretion" to consider Nelson's

challenge on the merits, we must independently exercise our own discretion on

review. *Nelson*, No. 39110-8-III, slip op. at 16; *cf. State v. Blazina*, 182 Wn.2d

827, 835, 344 P.3d 680 (2015) ("Each appellate court must make its own decision

to accept discretionary review."). After consideration of the ripeness doctrine, we

hold that Nelson's preenforcement challenge is not ripe for review; however, we

choose to reach the merits of his challenge based on the apparent conflict between

the divisions of the Court of Appeals.

1.    Nelson's preenforcement challenge requires further factual
       development

As discussed, the BA and UA testing conditions have never been enforced

against Nelson and they played no role in the revocation of his SSOSA. Moreover,

Nelson did not challenge the BA and UA testing conditions until he appealed from

his SSOSA revocation. Therefore, he is not entitled to review unless he can show

that (1) his challenge "is ripe for review on its merits" and (2) the BA and UA

13

testing conditions are a "manifest error affecting a constitutional right."[3] *State v. Cates*, 183 Wn.2d 531, 534, 354 P.3d 832 (2015); RAP 2.5(a)(3).  In this case, Nelson's preenforcement challenge to his BA and UA testing conditions is not ripe, so we do not consider whether he demonstrates manifest constitutional error. *State v. Peters*, 10 Wn. App. 2d 574, 583, 455 P.3d 141 (2019) (If a condition "is ineligible for review for one reason, we need not consider the other.").

A preenforcement challenge to community custody conditions is ripe for review when "'the issues raised are primarily legal, do not require further factual development, and the challenged action is final.'"  *Cates*, 183 Wn.2d at 534 (internal quotation marks omitted) (quoting *State v. Sanchez Valencia*, 169 Wn.2d 782, 786, 239 P.3d 1059 (2010)).  In addition, we "must consider the hardship" Nelson will face if we decline to review his challenge at this time.  *Sanchez Valencia*, 169 Wn.2d at 789.  Here, it is undisputed that the issues raised by Nelson's constitutional challenge are primarily legal and that the BA and UA testing conditions are final.  Thus, we consider only the need for further factual development and the risk of hardship Nelson would face if we declined review.

Further factual development is needed when the challenger's argument is based on the potential for "[s]ome future misapplication of the community custody

---

[3] A sentencing condition "does not have the same presumption of validity" as a legislative enactment, so Nelson "does not have to overcome a presumption of constitutionality." *State v. Bahl*, 164 Wn.2d 739, 753, 193 P.3d 678 (2008); *Sanchez Valencia*, 169 Wn.2d at 792.

condition," which necessarily depends "'on the particular circumstances of the attempted enforcement.'" *Cates*, 183 Wn.2d at 535 (quoting *Sanchez Valencia*, 169 Wn.2d at 789). For example, in *Cates*, this court declined to consider a preenforcement challenge to a condition requiring the defendant to "consent to home visits to monitor his compliance with other community custody provisions." *Id.* at 533. The defendant argued his challenge did not require further factual development because the condition, on its face, authorized unconstitutional searches. However, contrary to the defendant's argument, the condition as written did not authorize any searches, and it was expressly limited to monitoring the defendant's compliance with his supervision. Thus, this court held that the State must attempt to enforce the condition before the facts would be sufficiently developed to address the defendant's challenge on its merits and determine whether the circumstances of enforcement were unreasonable.

By contrast, in *Bahl*, this court *did* consider a defendant's preenforcement vagueness challenge to conditions prohibiting them from either possessing or accessing "'pornographic materials'" and possessing or having control of "'sexual stimulus material.'" *State v. Bahl*, 164 Wn.2d 739, 743, 193 P.3d 678 (2008) (quoting record). The defendant argued their challenge to the conditions' vague terms did not require further factual development because the questions are purely legal. We recognized that the defendant's case presented a unique situation as they

15

had objected to the conditions at both sentencing and on direct appeal and "there is nothing that will change between the present time and [the defendant]'s release that will affect the vagueness analysis." *Id.* at 752. In addition, we acknowledged that "many courts have addressed, as legal questions, vagueness challenges to [the same] terms" as those challenged by the defendant. *Id.* Thus, this court held the defendant's challenges were sufficiently ripe because they involve legal questions that can be resolved on the present record and addressing the challenges may reduce the risk of hardship.

Unlike *Bahl*, Nelson never objected to the conditions either at sentencing, his SSOSA review hearing, or at the SSOSA revocation proceeding. Further, Nelson's BA and UA testing conditions are not vague; the conditions as written, on its face, are clear. Thus, Nelson's case is more analogous to *Cates*, as the State has never attempted to enforce the BA and UA testing conditions on Nelson. Rather, like the defendant in *Cates*, Nelson argues that upon his eventual release from total confinement,[4] the State could request BA and UA testing to conduct an improper "fishing expedition for sanctions, jail time, and even additional crimes." Suppl. Br. of Pet'r at 21. Yet, as in *Cates*, the BA and UA testing conditions, as written, are limited to monitoring Nelson's compliance with other valid conditions prohibiting

---

[4] It appears that Nelson has several more years to serve in total confinement on his sentence of 87 months (7.25 years). CP at 62. He will receive credit for the time he spent on community custody before his SSOSA was revoked. RCW 9.94A.670(11).

alcohol and drug use. There is no evidence as to whether or how the State will "enforce the condition[s] by requesting and conducting" BA or UA testing. *Cates*, 183 Wn.2d at 535. Therefore, Nelson's preenforcement challenge is not ripe for review because it rests on the factually unsupported assumption that BA and UA testing will be "conducted in an unreasonable manner" or "used impermissibly as part of 'a fishing expedition to discover evidence of other crimes.'" *Olsen*, 189 Wn.2d at 134 (quoting *State v. Combs*, 102 Wn. App. 949, 953, 10 P.3d 1101 (2000)).

However, we acknowledge that occasionally, "the risk of hardship" to a defendant is sufficient "to justify review of [their] challenge before it is factually developed." *Cates*, 183 Wn.2d at 535. The risk is at its greatest when the challenged conditions will "immediately restrict[] the petitioners' conduct upon their release from prison." *Sanchez Valencia*, 169 Wn.2d at 791. Thus, where a condition "prohibit[s] possession of crime-related items" and requires the defendant to "immediately dispose of such items upon their release," we may exercise our discretion to reach the merits. *Cates*, 183 Wn.2d at 535-36 (discussing *Sanchez Valencia*, 169 Wn.2d 782; *Bahl*, 164 Wn.2d 739; *United States v. Loy*, 237 F.3d 251 (3d Cir. 2001)).

In *Cates*, we held that the risk of hardship was insufficient to justify review because complying with the challenged condition did not require the defendant to

17

do, or refrain from doing, anything upon his release until the State requested and conducted a home visit. We held that we needed more facts to determine whether the circumstances of enforcement, specifically the requiring of the defendant to consent, were unreasonable. In contrast, in *Bahl*, we held that the present record was sufficient to address the vagueness challenges and the risk of hardship on the defendant was significant to justify review as it may reduce the risk inherent in vague conditions. Our goals in reaching the merits was to avoid "piecemeal review" and the potential of a revocation proceeding, and to prevent hardship on the defendant who "must wait until [they are] charged with violating the conditions . . . before being able to challenge the conditions on th[e] basis" of vagueness. *Bahl*, 164 Wn.2d at 751.

Analogous to *Cates*, Nelson's BA and UA testing conditions, on its face, were included to help monitor compliance with other validly imposed conditions that prohibit his consumption of alcohol and nonprescribed drugs. Nelson's BA and UA testing conditions do not require him to do, or refrain from doing, anything upon his release, unless and until the DOC requests it. In addition, as discussed above, there is no indication that Nelson was ever asked to submit to BA or UA testing during the yearlong period he spent on community custody before his SSOSA was revoked. Consequently, without more, Nelson's challenge to his

18

conditions requires further factual development to determine if the circumstances of enforcement of the BA and UA testing is unreasonable.

Moreover, if Nelson had experienced any hardship from the BA and UA testing conditions while on community custody, he could have asked the court to modify or strike those conditions because "[t]he SSOSA statute gives courts explicit authority to modify discretionary conditions during annual treatment review hearings and at the treatment termination hearing." *State v. Petterson*, 190 Wn.2d 92, 101, 409 P.3d 187 (2018) (citing RCW 9.94A.670(7)-(9)). Yet, Nelson did not challenge the conditions until after his SSOSA was revoked. Thus, unlike *Bahl*, there is no risk of hardship that could justify reviewing Nelson's challenge before it is ripe because the conditions, as written, are clear on their face and he does not face a risk of being immediately restricted upon his release.

The distinctions between *Bahl* and *Cates* discussed above serve as guidance to lower courts in assessing ripeness of preenforcement challenges to community custody conditions, and we do not disturb either case.

2.    Mixed results in the Court of Appeals

Nelson concedes that the conditions prohibiting alcohol and drug use are statutorily authorized and constitutionally valid, although they are not crime related. Nevertheless, he asks this court to prohibit the State from monitoring his compliance with those conditions through BA and UA testing, citing article I,

section 7 of the Washington Constitution and *Olsen*, 189 Wn.2d 118. Nelson

asserts we must address the merits of his challenge because "there is a split among

the [C]ourt of [A]ppeals' divisions" as to whether article I, section 7 permits

compliance monitoring through BA and UA testing if "there is no evidence drugs

or alcohol contributed to the offenses." Pet. for Rev. at 28. He is correct that

Division One has taken a different approach to this issue than Divisions Two and

Three, although most of the relevant opinions are unpublished. Thus, while we

recognize that Nelson's challenge is not ripe, we take this opportunity to briefly

address the mixed results from the divisions of the Court of Appeals.

As noted, Division Three held in this case that under *Olsen*, the conditions

are valid because they are imposed to monitor compliance with valid probation

conditions. The Court of Appeals noted that Nelson "does not challenge" the trial

court's authority to prohibit him from using alcohol and controlled substances,

"even though alcohol" and "controlled substances played no role in his offenses."

*Nelson*, No. 39110-8-III, slip op. at 30, 29 (citing RCW 9.94A.703(3)(e), (2)(c);

*State v. Jones*, 118 Wn. App. 199, 206-07, 76 P.3d 258 (2003); *In re Pers.*

*Restraint of Brettell*, 6 Wn. App. 2d 161, 173, 430 P.3d 677 (2018)). Division

Three reasoned that "[b]ecause the court had authority to impose those

prohibitions, it was also permitted to impose conditions to monitor compliance

with the prohibitions." *Id.* at 30 (citing *Olsen*, 189 Wn.2d at 135; *State v. Vant*, 145 Wn. App. 592, 603-04, 186 P.3d 1149 (2008)).

Similarly, Division Two recently held that "under Olsen, the trial court ha[s] authority to impose [a BA and UA] testing condition in order to enforce prohibitions on drugs and alcohol regardless of its connection to the crime." *State v. Gililung*, No. 57466-7-II, slip op. (unpublished portion) at 37 (Wash. Ct. App. July 30, 2024), https://www.courts.wa.gov/opinions/pdf/D2%2057466-7-II%20Published%20Opinion.pdf, *petition for review filed*, No. 103497-1 (Wash. Sept. 25, 2024). As Division Three did in Nelson's case, Division Two recognized that a "trial court is permitted to prohibit the use of drugs or alcohol regardless of their connection to the crime." *Id.* at 36-37 (citing RCW 9.94A.703(2)(c), (3)(e)). Thus, in accordance with *Olsen*, Division Two held that "[o]nce these prohibitions are ordered, the trial court has the authority to impose testing to enforce compliance with them." *Id.* at 36 (citing *Olsen*, 189 Wn.2d at 135; *Vant*, 145 Wn. App. at 603-04).

In contrast, Division One holds that "there must be 'a reasonable relationship between the condition and defendant's behavior'" for random BA and UA testing conditions to be imposed. *State v. Ibarra*, No. 84771-6-I, slip op. at 14 (Wash. Ct. App. May 13, 2024) (unpublished) (quoting *State v. Martinez Platero*, 17 Wn. App. 2d 716, 726, 487 P.3d 910, *review denied*, 198 Wn.2d 1019 (2021),

https://www.courts.wa.gov/opinions/pdf/847716%20orderandopinion.pdf), *review denied*, 3 Wn.3d 1023 (2024). Division One has consistently taken this approach in multiple cases since 2018 and recently declined the State's request to consider those cases anew. Thus, although most of the opinions are unpublished, there appears to be mixed results among appellate authorities.

In its earliest case addressing this issue, Division One held in an unpublished opinion that *Olsen* permitted random UAs only because the condition "was narrowly tailored to address the probationer's" conviction for driving under the influence (DUI). *State v. Stark*, No. 76676-7-I, slip op. at 13 (Wash. Ct. App. Oct. 15, 2018) (unpublished), https://www.courts.wa.gov/opinions/pdf/766767.pdf, *review denied*, 192 Wn.2d 1020 (2019). However, Division One rejected the general proposition that random urinalysis is constitutional to monitor a standard condition prohibiting the use of controlled substances.

One year later, in 2019, Division One's unpublished opinion in *Greer* reached the same conclusion. In *Greer*, Division One explained its interpretation of *Olsen* to mean that "the State has a significant interest in supervising probationers when the condition was narrowly tailored to address the *specific offense of conviction*." No. 78291-6-I, slip op. at 20-21 (emphasis added). A few months later, Division One reaffirmed this approach in *State v. Monroy*, holding in an unpublished opinion that a trial court "could not require [the defendant] to

22

submit to suspicionless testing simply to monitor compliance with other conditions that were not crime related." No. 78597-4-I, slip op. at 17 (Wash. Ct. App. Jan. 21, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/785974.pdf, *review denied*, 195 Wn.2d 1020 (2020).

Following the unpublished opinions in *Stark*, *Greer*, and *Monroy*, Division One issued its only published opinion on this issue, *Martinez Platero*, 17 Wn. App. 2d 716. In *Martinez Platero*, the Court of Appeals "accept[ed] the State's concession" that a BA and UA testing condition must be stricken because it was not crime related. *Id.* at 726. Subsequently, Division One issued its most recent unpublished opinion, *Ibarra*, which relied on *Martinez Platero* to hold that "[c]urrent binding case[ ]law provides that there must be a reasonable relationship between community custody conditions requiring urinalysis and/or breath[]analysis and the defendant's behavior." No. 84771-6-I, slip op. at 14.

As discussed above, contrary to Division One, Divisions Two and Three have expressly held that these conditions are a lawful means to monitor other validly imposed community custody conditions, even if they do not relate to the underlying conviction. *E.g.*, *Gililung*, No. 57466-7-II, slip op. (unpublished portion) at 36-37; *In re Pers. Restraint of Alaniz*, No. 39631-2-III, slip op. 11-12 (Wash. Ct. App. Mar. 21, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/396312_unp.pdf. Although most of the relevant opinions are

unpublished, there have been mixed results on this issue between Divisions One,

Two and Three. Thus, we take this opportunity to review the merits of Nelson's

preenforcement challenge solely to reconcile the mixed results that have come

from the divisions of the Court of Appeals as to the correct interpretation of *Olsen*.

B.      BA and UA testing community custody conditions comply with article I,
        section 7

Our state constitution guarantees that "[n]o person shall be disturbed in

[their] private affairs, or [their] home invaded, without authority of law." WASH.

CONST. art. I, § 7. Article I, section 7 requires a two-pronged inquiry to determine

if a violation has occurred: "(1) whether the contested state action 'disturbed' a

person's 'private affair[s]' and, if so, (2) whether the action was undertaken with

'authority of law.'" *Olsen*, 189 Wn.2d at 123 (alteration in original) (quoting *State*

*v. Reeder*, 184 Wn.2d 805, 814, 365 P.3d 1243 (2015)). The BA and UA testing

conditions imposed here do disturb Nelson's "private affairs," however, if such a

disturbance occurs, it will be supported by the necessary "authority of law" to

satisfy article I, section 7.

1.      BA and UA testing does disturb an individual's private affairs,
        implicating article I, section 7

The first prong of the article I, section 7 analysis is not disputed. The parties

agree that when Nelson serves the community custody portion of his sentence, he

will have a reduced expectation of privacy. Nevertheless, the BA and UA testing

will still implicate Nelson's reduced privacy interests under article I, section 7. We accept the parties' agreement on this point.

In *Olsen*, this court considered the privacy expectations of probationers, "'whom a court has sentenced to confinement but who are serving their time outside the prison walls.'" *Id.* at 124-25 (quoting *State v. Jardinez*, 184 Wn. App. 518, 523, 338 P.3d 292 (2014)). In contrast to a person who is not serving a criminal sentence, a probationer has "a reduced expectation of privacy" because their sentence requires them to be "supervise[d] and scrutinize[d]" by the State. *Id.* Yet, probationers retain a greater expectation of privacy than incarcerated felons. Likewise, a person on community custody has a reduced expectation of privacy. Similar to probationers, those on community custody are not incarcerated, but their sentencing conditions prevent them from "enjoy[ing] constitutional privacy protection to the same degree as other citizens." *Id.* at 124.

BA and UA testing conditions clearly implicate the reduced privacy interests of a person on community custody. As to UA testing, this court has "consistently held that the nonconsensual removal of bodily fluids implicates privacy interests." *Id.* (citing *York v. Wahkiakum Sch. Dist. No. 200*, 163 Wn.2d 297, 307, 178 P.3d 995 (2008) (plurality opinion); *In re Juveniles A, B, C, D, E*, 121 Wn.2d 80, 90, 847 P.2d 455 (1993); *State v. Olivas*, 122 Wn.2d 73, 83, 856 P.2d 1076 (1993); *State v. Curran*, 116 Wn.2d 174, 184, 804 P.2d 558 (1991), *abrogated on other*

*grounds by State v. Berlin*, 133 Wn.2d 541, 947 P.2d 700 (1997)).  As we reaffirmed in *Olsen*, UA testing is "fundamentally intrusive" and "'can reveal a host of private medical facts about [a person], including whether [they are] epileptic, pregnant, or diabetic.'"  *Id.* (first alteration in original) (quoting *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 617, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989)).  Although *Olsen* addressed only UA testing, it is undisputed that BA testing raises similar privacy concerns.  Similar to UA testing and blood draws, a BA test "generally requires the production of alveolar or 'deep lung' breath for chemical analysis," implicating "similar concerns about bodily integrity."  *Skinner*, 489 U.S. at 616-17 (quoting *California v. Trombetta*, 467 U.S. 479, 481, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984)); *cf. Olsen*, 189 Wn.2d at 125-26 (citing *State v. Simms*, 10 Wn. App. 75, 83-84, 516 P.2d 1088 (1973)).

Thus, Nelson's reduced privacy interests will be implicated if the State attempts to enforce the BA and UA testing conditions during his term of community custody.  This intrusion on Nelson's lowered expectation of privacy is "'constitutionally permissible only to the extent necessitated by the legitimate demands'" of community custody.  *Olsen*, 189 Wn.2d at 125 (internal quotation marks omitted) (quoting *State v. Parris*, 163 Wn. App. 110, 117, 259 P.3d 331 (2011), *abrogated on other grounds by State v. Cornwell*, 190 Wn.2d 296, 412

26

P.3d 1265 (2018)).  Therefore, we must determine whether the BA and UA testing

conditions, as written, are supported by authority of law.

    2.       The BA and UA testing conditions are supported by authority of law

As to the second prong of the article I, section 7 inquiry, the BA and UA

testing conditions are supported by "authority of law" if, but only if, they serve "a

compelling interest, achieved through narrowly tailored means."  *Id.* at 128.  We

hold that the necessary authority of law is the original judgment and sentence when

the SSOSA was imposed, conditioning Nelson to refrain from the use of alcohol

and drugs.  These prohibitions are statutorily authorized and do not have to be

crime related to be imposed.  The testing conditions, as written, are narrowly

tailored—not random—for monitoring purposes.  Thus, the conditions are

constitutional.

The undisputed purpose of the BA and UA testing conditions is to monitor

Nelson's compliance with other conditions prohibiting him from using alcohol or

drugs.  It is undisputed that the conditions prohibiting alcohol and drug use were

validly imposed pursuant to the sentencing court's statutory authority.  *See* RCW

9.94A.703(2)(c), (3)(e); *Jones*, 118 Wn. App. at 206-07.  Moreover, because the

DOC "may require 'affirmative acts necessary to monitor compliance with the

order of a court,'" random BA and UA testing conditions are "*statutorily* valid."

*In re Pers. Restraint of Luna Huezo*, No. 38697-0-III, slip op. at 31 (Wash. Ct.

App. June 29, 2023) (unpublished) (emphasis added) (quoting RCW 9.94A.030(10)), https://www.courts.wa.gov/opinions/pdf/386970_unp.pdf; *see also State v. Cortez*, No. 84744-9-I, slip op. at 26 (Wash. Ct. App. Aug. 26, 2024) (unpublished) ("[T]he [BA and UA testing] condition[s] [are] a general exercise of the Department of Corrections' monitoring powers under RCW 9.94A.703(2)(c) and (3)(e)."), https://www.courts.wa.gov/opinions/pdf/847449.pdf.  However, Nelson argues that random BA and UA testing is *constitutionally* prohibited because his underlying offenses have no "'direct nexus'" to drug or alcohol use.  Suppl. Br. of Pet'r at 21, 24.  We reject Nelson's argument because he misinterprets our opinions in *Olsen* and *Juveniles*, and we hold that these conditions as written, regardless of their crime-relatedness, do not make the conditions unconstitutional.

In both *Olsen* and *Juveniles*, we upheld sentencing conditions requiring the defendants to submit to intrusive testing.  *See Olsen*, 189 Wn.2d 118 (UA testing); *Juveniles*, 121 Wn.2d 80 (human immunodeficiency virus (HIV) testing).  Both opinions recognized the defendants had reduced privacy interests due to their convictions.  *Olsen*, 189 Wn.2d at 124-26; *Juveniles*, 121 Wn.2d at 92-93.  In both cases, we recognized that the State had several compelling interests at stake: "promot[ing] and assess[ing] the rehabilitation of a probationer," "protect[ing] the public," "protect[ing] the victim, the public, and the offender from a serious public

28

health problem," and "effective prison and probation management." *Olsen*, 189 Wn.2d at 129; *Juveniles*, 121 Wn.2d at 92, 94. Both opinions also held that the testing requirements were narrowly tailored. In *Olsen*, we recognized that random UA testing is "a crucial monitoring tool that is limited in scope when imposed only to assess compliance with a valid prohibition on drug and alcohol use." 189 Wn.2d at 130. In *Juveniles*, we approved mandatory HIV testing of sexual offenders "because it is aimed at a high-risk group, and it limits disclosure of test results." 121 Wn.2d at 98.

Rather than following the thorough analysis described above, Nelson seeks to elevate isolated language stating that the nature of the underlying offenses had a "'direct nexus'" to the type of testing at issue. *Juveniles*, 121 Wn.2d at 93 (quoting Bernadette Pratt Sadler, Comment, *When Rape Victims' Rights Meet Privacy Rights: Mandatory HIV Testing, Striking the Fourth Amendment Balance*, 67 WASH. L. REV. 195, 207 (1992)); *see also Olsen*, 189 Wn.2d at 129, 133. Neither *Olsen* nor *Juveniles* rested entirely on this nexus, and we never stated that it was a dispositive factor. Instead, both opinions cited the nexus between the testing and the underlying offense to support, in part, broader holdings on the State's compelling interests and the defendants' reduced expectations of privacy. *See Olsen*, 189 Wn.2d at 129, 133; *Juveniles*, 121 Wn.2d at 92-93.

Nelson asks us to convert this partial analysis into a dispositive inquiry, arguing that in all cases, "there must be some 'direct nexus' between the individual's criminal behavior and random UA/BA testing." Suppl. Br. of Pet'r at 24. Nelson does not clearly explain whether, in his view, this "nexus" is necessary to show a compelling interest, narrow tailoring, or both. In any event, we reject Nelson's view and affirm that the BA and UA testing conditions are narrowly tailored to serve the State's compelling interest in monitoring Nelson's compliance with valid conditions of his community custody.

Nelson appears to believe the only compelling interest that could support BA and UA testing conditions is the prevention of similar crimes. *See id.* at 20 ("random UA/BA testing would be unlikely to reveal anything about [Nelson]'s rehabilitation or progress in treatment with respect to the crimes of conviction"). Similarly, as discussed above, Division One interprets *Olsen* to mean that "the State has a significant interest in supervising probationers" through random BA and UA testing only when it is "narrowly tailored to address the *specific offense of conviction*." *Greer*, No. 78291-6-I, slip op. at 20-21 (emphasis added). We take this opportunity to clarify that this interpretation of *Olsen* is incorrect.

Contrary to Nelson's reading, *Olsen* never expressly stated that random UA testing for alcohol consumption is constitutional only in a case involving a DUI conviction or only when the condition is crime related. Rather, *Olsen* recognized

30

that when a person serves a portion of their sentence "'outside the prison walls,'" the State has a compelling interest in fulfilling its "duty not just to promote and assess the rehabilitation of a probationer, *but also to protect the public*." 189 Wn.2d at 124-25 (emphasis added) (quoting *Jardinez*, 184 Wn. App. at 523), 129 (citing *State v. Kuhn*, 7 Wn. App. 190, 194, 499 P.2d 49 (1972)).

Here, it is true that random BA or UA testing "would not necessarily reveal anything about [Nelson]'s progress or rehabilitation *with respect to the crimes of conviction*." *Greer*, No. 78291-6-I, slip op. at 22 (emphasis added). However, this fact is not dispositive because the State has compelling interests in "effective prison and probation management" and "protect[ing] the public." *Juveniles*, 121 Wn.2d at 94; *Olsen*, 189 Wn.2d at 129. Protection of the public is achieved not merely by preventing *similar* crimes but by ensuring the person on community custody is willing and able to comply with *all* applicable legal requirements. The State cannot possibly do so without the necessary tools "to monitor compliance with a validly imposed [sentencing] condition." *Olsen*, 189 Wn.2d at 126. Thus, the State has a compelling interest in monitoring Nelson's compliance with his valid community custody conditions prohibiting drug and alcohol use, regardless of the specific facts of his underlying offenses.

Nelson also appears to argue that even if the State has a compelling interest, the BA and UA testing conditions are not narrowly tailored. It is undisputed that

as in *Olsen*, random BA and UA testing is authorized here only for the limited purpose of assessing Nelson's compliance with a valid prohibition on drug and alcohol use. *Olsen* recognized that such testing "is a narrowly tailored monitoring tool imposed pursuant to a valid prohibition on drug and alcohol use." *Id.* at 134. Divisions Two and Three of the Court of Appeals have reached the same conclusion, "regardless of [any] connection to the crime," because random testing to monitor compliance with validly imposed conditions "is narrowly tailored for that purpose." *Gililung*, No. 57466-7-II, slip op. (unpublished portion) at 37; *Alaniz*, No. 39631-2-III, slip op. at 12. Nevertheless, in Nelson's view, random testing is unjustified because his CCO "may conduct UA/BA testing if they have a well-founded suspicion that a violation of those conditions has occurred." Suppl. Br. of Pet'r at 25 (citing *Cornwell*, 190 Wn.2d at 302). We reject this argument, for three reasons.

First, as *Olsen* explained in detail, "random testing prevents individuals from planning ahead and avoiding detection." 189 Wn.2d at 131. By contrast, "[r]equiring reasonable suspicion as a basis to test could make it prohibitively difficult" to monitor compliance. *Id.* As a result, this court has "approved of monitoring tools used to enforce a valid parole or probation conditions," including polygraph and UA testing. *Id.* at 130 (citing *State v. Riles*, 135 Wn.2d 326, 339, 957 P.2d 655 (1998), *abrogated on other grounds by Sanchez Valencia*, 169

Wn.2d 782; *Combs,* 102 Wn. App. at 952). We have also held that "random UAs, if limited to monitoring for the presence of alcohol, marijuana, or nonprescribed drugs, reveal a comparatively limited amount of private information" as compared to a random search of "the offender's home, vehicle, or electronic devices." *Id.* at 132-33. BA and UA testing merely allows the State to ensure compliance with valid community custody conditions ordered by the sentencing court. It does not authorize a "fishing expedition." *Contra* Suppl. Br. of Pet'r at 21.

Second, because random BA and UA testing reveals a relatively limited amount of private information, Nelson's reliance on *Cornwell* is misplaced. There, the defendant violated his probation by failing to report to the DOC. As a result, his CCO conducted a warrantless search of the defendant's car, and everything in it, to look for further violations. This court held the search violated article I, section 7 because it lacked a nexus to the alleged probation violation. In doing so, we explicitly distinguished the "open-ended property searches" at issue in *Cornwell* from the "random UA testing" at issue in *Olsen*, where UA testing "was used to evaluate compliance with a *particular* probation condition that prohibited drug and alcohol use." *Cornwell*, 190 Wn.2d at 305 & n.3. The same is true of the BA and UA testing conditions in this case. Thus, by its own terms, *Cornwell* does not apply here.

Finally, Nelson overlooks the fact that requiring reasonable suspicion for BA or UA testing could ultimately prove *more* intrusive than random testing. As discussed, it is undisputed that the conditions prohibiting drug and alcohol use are valid, and *Olsen* explicitly recognizes that the State must have some way "to monitor compliance with a validly imposed [sentencing] condition." 189 Wn.2d at 126. The available options for compliance monitoring, as set forth in the briefing, are either (1) random testing or (2) testing only on reasonable suspicion of a violation.

Random testing may be the least intrusive alternative because, as we observed in *Olsen*, "[d]rug or alcohol impairment can be difficult to detect by observation." *Id.* at 131. Thus, a CCO may be concerned about a defendant's possible alcohol or drug use but unable to form a reasonable suspicion based on their day-to-day interactions. This is *particularly* true if the defendant does not have a history of drug and alcohol use because, without such history, the CCO cannot know how the defendant may behave when impaired. In that case, the CCO may feel compelled to closely monitor all of the defendant's actions and carefully scrutinize all of their behavior "to carry out [their] responsibilities of supervising the probationer and accurately assessing progress toward rehabilitation." *Id.* at 131-32. By contrast, random BA and UA testing, "if limited to monitoring for the presence of alcohol, marijuana, or nonprescribed drugs, reveal a comparatively

limited amount of private information." *Id.* at 133. Thus, a condition authorizing random testing is, arguably, more narrowly tailored and less intrusive than a rule requiring reasonable suspicion. As previously discussed, we do not know what facts might trigger enforcement of the conditions that Nelson submit to either BA or UA testing, and it is worth noting the conditions do not say random or routine testing.

Therefore, we hold that the BA and UA testing conditions, as imposed, are narrowly tailored to achieve the State's compelling interest in monitoring Nelson's compliance with his validly imposed community custody conditions prohibiting alcohol and drug use because (1) the testing is limited in scope and only allowed to check for compliance, not as a fishing expedition, (2) the randomness makes the testing effective and prevents Nelson from circumventing the process, and (3) requiring reasonable suspicion could ultimately be *more* intrusive by incentivizing CCOs to closely monitor Nelson's behavior. Our holding, here, is limited to the specific terms of the conditions, which, as it stands and without more, is sufficiently narrowly tailored to meet constitutional requirements. However, our holding does not preclude an inquiry on another day in another case where the method of enforcement is challenged as unreasonable.

CONCLUSION

We affirm the Court of Appeals' holding that Nelson's preenforcement challenge is not yet ripe because further factual development is necessary. Further, we affirm that the BA and UA testing conditions, as written, are narrowly tailored to serve the State's compelling interest in monitoring Nelson's compliance with the statutorily authorized prohibition conditions, notwithstanding the specific facts of his underlying offense. If and when the State attempts to enforce the BA and UA testing conditions in an "unreasonable manner" when Nelson is eventually released from total confinement, he may bring a new challenge at that time.

_____
Yu, J.

WE CONCUR:

_____
Stephens, C.J.

_____
Gordon McCloud, J.

_____
Johnson, J.

_____
Montoya-Lewis, J.

_____
Madsen, J.

_____
Whitener, J.

_____
González, J.

_____
Díaz, J.P.T.